Barbara HANDSCHU, Ralph DiGia, Alex McKeiver, Shaba Om, Curtis M. Powell, Abbie Hoffman, Mark A. Segal, Michael Zumoff, Kenneth Thomas, Robert Rusch, Annette T. Rubinstein, Mickey Sheridan, Joe Sucher, Steven Fischler, Howard Blatt, Ellie Benzoni, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

SPECIAL SERVICES DIVISION, a/k/a Bureau of Special Services; William H.T. Smith; Arthur Grubert; Michael Willis; William Knapp; Patrick Murphy; Police Department of the City of New York; John V. Lindsay; and various unknown employees of the Police Department acting as undercover operators and informers, Defendants.

No. 71 Civ. 2203–CSH.

United States District Court,
S.D. New York.

March 7, 1985.

Frederick A.O. Schwarz, Corp. Counsel, New York City, for defendants.

Paul G. Chevigny, Jethro M. Eisenstein, Friedman & Eisenstein, Martin R. Stolar, Stolar, Alterman, Wagner & Boop, Franklin Siegel, New York City, for plaintiff class.

Victor Rabinowitz, Betty St. Clair, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., New York City, for National Emergency Civil Liberties Committee and the Bill of Rights Foundation.

Marshall Perlin, New York City, for Michael Rubin, et al.

Michael Krinsky, Martin Popper, New York City, for National Lawyers Guild.

Michael Ratner, New York City, for Center for Constitutional Rights and Puerto Rican Socialist Party.

Robert Boyle, Elizabeth Fink, New York City, for Richard Dhoruba Moore.

John Abt, Jeffrey Schwartz, New York City, for Communist Party, U.S.A. and Communist Party, N.Y.S.

O. Stephen Paganuzzi, New York City, for Charlene Mitchell, National Alliance Against Racist & Political Repression, U.S. Peace Council and Labor Research Assn.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

This is a class action under 42 U.S.C. § 1983, originally brought against the May-

or of the City of New York, its Police Commissioner, and other police officials who played a role in the Security and Investigation Section ("SIS") of the New York City Police Department ("NYPD"). The action embraces the named defendants and any successor organization or unit within the NYPD or, in the case of individual defendants, their successors in office or function. In point of fact, the NYPD unit whose activities form the subject matter of the litigation is now called the Public Security Section ("PSS") of the NYPD's Intelligence Division. The original individual defendants have been replaced by successors.

The complaint, filed in 1971, was in the name of sixteen individual plaintiffs, affiliated with various named political action groups, who on behalf of themselves and other similarly situated claimed that the SIS had violated their constitutional rights by various surveillance and other activities.

Defendants moved to dismiss the complaint under Rule 12(b)(1) and (6), F.R. Civ.P. They also challenged maintenance of the suit as a class action. Judge Weinfeld denied the motion to dismiss. 349 F.Supp. 766 (S.D.N.Y.1971). His opinion contains a useful summary of plaintiffs' claims:

"The complaint alleges that certain practices and conduct of SIS infringe plaintiffs' constitutional rights and these are set forth under seven specific categories: (1) informers; (2) infiltration; (3) interrogation; (4) overt surveillance; (5) summary punishment; (6) intelligence gathering; (7) electronic surveillance. In end result it is charged that these practices have a 'chilling effect' on plaintiffs and members of their class in the exercise of their constitutional rights of freedom of speech, assembly and association; that they violate their rights against unlawful search and seizure because the SIS proceeds without obtaining warrants or judi-

cial authorization; also that they violate their rights of privacy and to substantive and procedural due process; and finally, that the effect of such activities is to visit upon them cruel and unusual punishment. Thus, the broad sweep of plaintiffs' complaint charges violations of the First, Fourth, Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution."

*Id.* at 768–69.

He left the question of class certification for another day. *Id.* at 771.

After discovery addressing the issue, this Court certified a class pursuant to Rule 23(a), (b)(1)(A) and (b)(2). The class was defined as follows:

"All individuals resident in the City of New York, and all other persons who are physically present in the City of New York, and all organizations located or operating in the City of New York, who engage in or have engaged in lawful political, religious, educational or social activities and who, as a result of these activities, have, been, are now or hereafter may be subjected to or threatened by infiltration, physical and verbal coercion, photographic, electronic and physical surveillance, provocation of violence, recruitment to act as police informers and dossier collection and dissemination by defendants and their agents."

Memorandum Opinion and Order of May 24, 1979.

The case is now before the Court on the motion of counsel for plaintiff class and defendants to approve a negotiated settlement, of which the class was given appropriate notice.[1] A fairness hearing has extended over a number of days, interspersed by requiring defendants to answer interrogatories as to the meaning and implementation of the settlement, and the filing of extensive briefs and presentation of oral argument.

---

1. Notice of the proposed settlement and the class members' right to file objections was given by newspaper publication. Certain objectors moved by order to show cause to challenge the adequacy of the notice as given, in respect of

both its text and dissemination. Those challenges were rejected in the Court's Memorandum Opinion of April 6, 1981, familiarity with which is assumed.

The settlement is resisted by a number of class members (hereinafter the "objectors").

## I.

### The Certified Class

At first, certain objectors contended that the certified class was unworkably broad and vague, reached impermissibly into the future, usurped a legislative function, and was "facially unconstitutional."

However, in section 1983 litigation against the Chicago police department and other law enforcement agencies, which in other respects the objectors regard with relative favor, virtually identical class certifications issued. *See Alliance to End Repression v. Rochford*, 565 F.2d 975, 976 (7th Cir.1977); *Alliance to End Repression v. City of Chicago*, 91 F.R.D. 182, 187 (N.D.Ill.1981); *Alliance to End Repression v. City of Chicago*, 561 F.Supp. 537, 541 (N.D.Ill.1982). Objectors, confronted by that precedent, still profess unease with the class description but no longer argue "that the class is on its face unconstitutional." Main brief at 54.

■ Nor is it: as the *Alliance* courts, trial and appellate, recognized, where class litigation seeks to safeguard broad constitutional rights *in futuro*, the class must be equally broad in scope and time. If the class could not be so structured, class actions would cease to be a viable alternative means of challenging police surveillance activities. Individual suits, and efforts (surely problematical) to obtain legislation, would remain; but precedent shows that class actions have a potentially useful role to play. There is an irony in condemning as "unconstitutional" because of its boundaries a class whose boundaries are necessitated by the constitutional interests sought to be protected.

■ The class certification is appropriate. Accordingly the motion turns upon the merits of the proposed settlement, whose provisions will now be considered.

## II.

### The Proposed Settlement

#### (a) Introduction

The proposed settlement takes the form of a Stipulation of Settlement to be endorsed by Court order, and "Guidelines" incorporated by reference in the stipulation. Copies of these documents appear as Appendix A to this opinion. The salient features are summarized below.

The Stipulation provides for discontinuation of the action with prejudice upon defendants' satisfaction of specified terms and conditions. These include the promulgation and adoption of the Guidelines within 30 days of entry of the Court-approved stipulation. Stipulation, p. 3, ¶ 1.

Paragraphs 2–5 of the Stipulation deal with the inspection and disposition of past and current files maintained by PSS and its predecessors. Paragraph 6 contains procedures for claimed violations of the Stipulation. Paragraph 7 specifies the claims that the Stipulation settles. I discuss these provisions *infra*. First I will summarize the Guidelines.

#### (b) The Guidelines

The Guidelines deal with future collection, retention and dissemination of information by the PSS. They begin with a "General Statement of Policy" which reads as follows:

"Activities of the Public Security Section (hereafter PSS) of the Intelligence Division will conform to constitutionally guaranteed rights and privileges. Information shall be collected, retained and disseminated by the PSS only in accordance with the provisions set forth herein."

Section II of the Guidelines contains certain definitions. One of them defines the "Authority" as "a board established pursuant to Section III of these Guidelines." Section II(B). Section III establishes the "Authority" referred to in Section II(B). Section III provides:

"There is hereby established an Authority to oversee the activities of the PSS of the Intelligence Division. It shall consist of three members who shall act as a body, to wit, the First Deputy Commissioner of the Police Department, the Deputy Commissioner for Legal Matters of the Police Department, and a civilian member appointed by the Mayor upon consultation with the Police Commissioner for a term revocable at will. The decisions of the Authority as set forth herein shall be by majority vote and shall be binding upon the PSS. The day-to-day operations of the PSS of the Intelligence Division shall continue to be the responsibility of the Commanding Officer, Intelligence Division."

Section IV is captioned "Conduct of Investigations and Role of Authority." Section IV(A) provides generally:

"The Police Department shall not engage in any investigation of political activity except through the PSS of the Intelligence Division or its successor and such investigations shall be conducted as set forth in these guidelines."

The section then deals with a number of specific situations and contingencies.

The first of these is triggered by "receipt of information concerning a planned event," Section IV(B). The PSS "may conduct an Event Planning Inquiry (EPI) in order to preserve the peace, deploy manpower for control of crowds and to protect the right of individuals to freedom of speech and assembly." Police personnel conducting an EPI must identify themselves as such to the sponsoring organization, its officials or persons in authority. The police may seek only limited information about the planned event. Section B(IV)(1–10). While PSS may retain information concerning past events, it may be used "only to document claims for governmental funding or reimbursement, and to assist in allocation of Police Department resources for future events." No individual or group names will be included in PSS files because they were included in an EPI report; nor shall other EPI-generated information be retained unless a Section IV(C) investigation is undertaken.

Section IV(C) provides:

"When specific information has been received by the Police Department that a person or group engaged in political activity is engaged in, about to engage in or has threatened to engage in conduct which constitutes a crime the PSS is authorized to commence an investigation of such person or group,"

subject to limitations thereafter specified.

Section IV(C)(1) requires PSS, before initiating an investigation, to submit to the Authority "an Investigation Statement which specifies the factual predicate therefor." The statement may be filed within 48 hours after initiation "upon good cause shown." A Section IV(C) investigation may be conducted for 30 days without the Authority's approval, provided an Investigation Statement has been filed. Section IV(C)(2). Within 30 days after initiation of an investigation PSS must request in writing the Authority's approval to continue it, summarizing the information obtained to date. The Authority may grant the extension for an additional 60 days if "PSS has demonstrated good cause for the investigation and demonstrated that such extension is necessary to reasonably pursue the investigation," Section IV(C)(4)(a); or deny it if PSS fails to make these showings, Section IV(C)(4)(b), in which event the Authority directs discontinuance of the investigation, the submission of a report, and determines the disposition of the files generated by it. These procedures govern "each subsequent request made to the Authority by the PSS." *Ibid.*

Section IV(C)(5) provides as follows:

"The Authority shall not be a substitute for any prior judicial screening required by law. Accordingly, these procedures shall not be construed either to prevent or relieve the PSS, where applicable provisions of law require, from seeking a judicial warrant authorizing conduct, such as searches and seizures of persons, places or things or communications, for which such warrant is required by law."

Section IV(C)(6) regulates the use of "undercover personnel" in Section IV(C) investigations. "Undercover" is defined by Section II(D) as follows:

"An employee or agent of the New York City Police Department who joins or participates in a political organization for the purpose of investigation without disclosing police affiliation."

Subject to "exigent circumstances" discussed below, use of undercovers is permitted "only after approval by the Authority," which the Commanding Officer of the Intelligence Division must seek in a writing setting forth "all the salient facts of the investigation, as well as the reasons for the application." Section IV(C)(6). Section IV(C)(6)(a) provides:

"Approval will be granted only upon a showing to the Authority that there is good cause for the investigation and that the use of undercover personnel is essential to develop information about the activities of the person, group or organization under investigation. In the absence of such a showing, approval for the use of undercover personnel shall be denied."

The Authority must act on a request for undercovers within 15 days. The approval is for 30 days. "Extensions for 60 day periods shall be sought and may be granted on the same terms and conditions as approval in the first instance." Section IV(C)(6)(b).

Section IV(C)(6)(c) provides:

"Upon a showing of exigent circumstances, the request for approval may be submitted within 48 hours, exclusive of Saturdays, Sundays or legal holidays, after the commencement of use of undercover personnel. The Authority shall act on each such request within ten days. If exigent circumstances are not shown, such request for approval shall be summarily denied, and the Authority shall order the undercover operation terminated.

Section IV(c)(7) deals with the attendance of "investigators at public activities of political organizations." Section II(E) defines an "investigator" as follows:

"An employee of the New York City Police Department who attends public functions of a political organization for the purpose of gathering information on political activity without disclosing police affiliation."

Investigators, except for the collection of Section IV(B) information, are subject to the Guidelines procedures, which require the filing of an Investigation Statement, but not the Authority's prior approval.

Section IV(C)(8) provides that the use of electronic or mechanical surveillance "in cases where a warrant is not required by law" are subject to Guidelines procedures, which require the filing of an Investigation Statement, but not the Authority's prior approval.

Section V is captioned "Review of Records to Determine Compliance." Section V(A) permits any person or group or organization member having reason to believe that the person, group or organization has been named in PSS files "as a result of an investigation in connection with or related to his, her or its political activities" [2] to request in writing that the Authority inquire of the PSS whether it maintains a file including that name. The PSS must disclose to the Authority whether an investigation was conducted with respect to the individual, group or organization; the manner in which it was conducted; and the information gathered. The Authority must determine whether "an investigation was conducted in conformity with these Guidelines...." If no file containing the name exists, or if the Authority determines that the investigation conformed to the Guidelines, the Authority so notifies the requesting party, recording the fact in the annual report required by Section IX.

---

**2.** "Political activity" is defined in Section II(A) as follows:

"The exercise of a right of expression or association for the purpose of maintaining or changing governmental policies or social conditions."

Under Section V(B), "[i]f the inquiry reveals or the Authority otherwise becomes aware" that an investigation departed from the Guidelines, the Authority is required to obtain full information and documents from PSS, conduct an inquiry into the cause of non-compliance, and report to the Police Commissioner, who "shall initiate disciplinary measures as appropriate." Section V(B)(1)–(3). The Authority also must determine "the disposition of any information improperly acquired," Section V(B)(4). In connection with that determination the Authority must notify the subject individual or group of non-compliance and, upon the latter's request, grant permission to inspect the improperly acquired material, Section V(B)(4)(a), (b), unless disclosure "would result in a substantial threat to the life or safety of an individual; or where there is a predicate for an on-going investigation" under the Guidelines, Section V(B)(4)(e). The Authority may also consider ultimate destruction or retention of the material. Section V(B)(4)(c), (d).

Section V(C) forbids the commencing of an investigation "solely because a party requested a review of records as provided herein."

Section VI is captioned: "Permitting Entries to Files and Index Cars [sic][3] of Police Security Section—Specific Criteria." Information may be collected, maintained and indexed only when collected pursuant to the Guidelines. Section VI(A). Information from publicly available sources may not be indexed or filed in PSS. *Ibid.* "An individual's or organization's political, religious, sexual or economic preference may not be the sole basis upon which the PSS develops a file or index card on that individual or organization." Section VI(C). Without the written authorization of the Authority, the PSS may not maintain information that an individual has signed a political petition, or that his or her name appears on a mailing list, or that he or she has "monetarily supported a political or religious group or its aims," or has "authorized a

published writing expounding a particular political or religious view." Section VI(B).

Section VII governs "Dissemination of Records." Distribution of information collected under the Guidelines is limited "to law enforcement agencies or government agencies conducting security clearance procedures." Section VII(A). The Commanding Officer of the division, or an available superior officer in his absence, must screen all requests for intelligence information. Section VII(B). Detailed internal records are generated by requests. *Ibid.* Requesting parties are put on notice of the Guidelines, and a restrictive statement advising of the Guidelines and this Court's order is stamped on the forwarding letter. Section VI(D). Further records are generated by actual dissemination. Section VI(E). If any information on file is subsequently found to be inaccurate, the Commander must so notify all agencies to which it was disseminated. Section VI(F).

Sections VIII and IX specify review and reporting procedures. Every 12 months the Intelligence Division Commander must cause a review to be made of the PSS files, and submit a written report to the Authority, for the purpose of determining "to the fullest extent possible that no files are being kept which violate Guidelines." Section VIII. Each calendar year the Authority must forward a comprehensive statistical report, including "[t]he number of violations of these procedures by the PSS and the remedial steps taken," to the Police Commissioner for submission to the Mayor. Section IX.

#### (c) *The Stipulation*

The Stipulation of Settlement, after specifying defendants' promulgation of the Guidelines as its first condition, goes on to deal with the disposition of presently existing files of PSS and its predecessor agencies.

Defendants currently maintain information on index cards and files at Police Headquarters. The Stipulation permits

---

**3.** "Cars" is undoubtedly intended to read "Cards."

them to dispose of all cards and files predating January 1, 1955 "in accordance with law." Stipulation ¶ 2. Files containing entries made on or after January 1, 1955 and before January 1, 1960 will be retained for six months following entry of the Stipulation, and files containing entries from January 1, 1960 to the date of entry will be retained for one year. ¶ 2(a), (b).

Within 30 days of the entry of the Stipulation, defendants are to give notice by publication in the New York Times of class members' right to inspect and copy these files. That right of inspection and copying exists during the six-month and one year periods specified in ¶ 2. Those requesting inspection must fill out a form, identify themselves, and (if applying on behalf of an organization) demonstrate their authority to do so, or (in the case of defunct organizations) affirm that they were once members. ¶ 3. The PSS will review its files in response to such a request, and advise the requesting party of the existence or non-existence of material, further giving a date for inspection and copying if material exists. *Ibid.* Disclosure, inspection and copying may be denied:

"... when the requested file relates to a current investigation or when information was collected in the course of an investigation based on specific information that the subject engaged in, was about to engage in, or threatened to engage in conduct constituting a crime or when the disclosure of the file would endanger the life or physical safety of any person. In case of any denial, the appeal procedure shall be a written request for review by the Authority established in the annexed guidelines. This procedure may also be employed for denial of the existence of requested information."

¶ 4.

The police will not retain any list of persons who invoke these procedures. ¶ 5. After the time periods specified in ¶ 2(a) and (b), the defendants may, in respect of files for which no request has been received, dispose of them "in accordance with law."

The two concluding paragraphs of the Stipulation are set forth in their entirety:

"6. Counsel for plaintiffs shall notify defendants by certified mail of any claimed violation by defendants of the provisions of this stipulation. That notice shall specify the violation and shall be made to both the Office of the Corporation Counsel and the Police Commissioner. Counsel for plaintiffs agree to provide 30 days notice of any claimed violation by defendants of the provisions of this stipulation in order to give defendants a reasonable opportunity to cure such claimed violations as a condition precedent to moving to punish defendants for contempt.

"7. This stipulation constitutes a full and final adjudication with respect to the claims of the plaintiff class for injunctive and declaratory relief as stated in the complaint. Any claim based solely upon the collection and/or retention of information about a person or an organization by the New York City Police Department is also settled by this stipulation."

### III.

*The Criteria and Bases for Judicial Review of the Proposed Settlement*

In *Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir.1982), *cert. denied,* — U.S. ——, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983), Judge Friendly wrote: "The central question raised by the proposed settlement of a class action is whether the compromise is fair, reasonable and adequate.... The primary concern is with the substantive terms of the settlement: 'Basic to this ... is the need to compare the terms of the compromise with the likely rewards of litigation.'" (citing and quoting *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424–25, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968)).

The measure of litigation's "likely rewards" depends on the nature of the suit.

If it is for money damages, the settlement amount is measured against the amount plaintiffs are likely to recover, having in mind the risks of litigation. Where, as here, the suit sounds only in equity, the relief achieved by the proposed settlement is measured against the Court's likely decree after trial. That exercise has two components: (1) plaintiffs' prospects of proving their claims, and (2) assuming plaintiffs' success on the merits, the likelihood of the Court giving the requested declaratory and injunctive relief. *Alliance to End Repression v. City of Chicago, supra,* 91 F.R.D. at 197–98.

Overarching these considerations are the "weighty justifications, such as the reduction of litigation and related expenses, for the general policy favoring the settlement of litigation," *Weinberger, supra,* at 73. There is an "overriding public interest in favor of settlement," especially in class actions, where "a fair settlement need not satisfy every concern of the plaintiff class, but may fall anywhere within a broad range of upper and lower limits. '[T]he essence of settlement is compromise ... a solution somewhere between the two extremes.'" *Alliance to End Repression v. City of Chicago, supra,* at 195, citing and quoting *Armstrong v. Board of School Directors,* 616 F.2d 305, 312–13, 315 (7th Cir.1980).

■ The trial judge's evaluation of a proposed settlement must be an informed one. In *Protective Committee for Independent Stockholders of TMT Ferry, Inc. v. Anderson, supra,* it was said that the judge must "apprise[ ] himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." 390 U.S. at 424, 88 S.Ct. at 1163. To that pronouncement we add Judge Friendly's *caveat* in *Weinberger, supra:* "However, 'all' cannot really mean 'all.' The Supreme Court could not have intended that, in order to avoid a trial, the judge must in effect conduct one." 698 F.2d at 74 (citing Second Circuit cases). The Second Circuit's requirements, declared in *Weinberger,* are that "the com-

promise be the result of armslength negotiations and that plaintiffs' counsel have possessed the experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests," *ibid.*

■ "Discovery" within the context of class action settlement need not be formal discovery under the Federal Rules of Civil Procedure. To adequately represent the class, counsel must demonstrate access to sufficient *"information* regarding the facts of their case"; where that information exists, "we are not compelled to hold that formal discovery was a necessary ticket to the bargaining table." *In re Corrugated Container Anti-Trust Litigation,* 643 F.2d 195, 211 (5th Cir.1981) (emphasis added) (Court approved settlement even though "very little *formal* discovery was conducted and ... there is no voluminous record in the case," *ibid.,* citing and quoting *Cotton v. Hinton,* 559 F.2d 1326, 1332 (5th Cir.1977) (emphasis in original). This is common sense. Knowledge is more important than its source. To hold otherwise would exalt form over substance.

■ The courts reserve special scrutiny for cases where settlement negotiations precede class certification, with notice of certification simultaneous with that of settlement. Such a case is *Plummer v. Chemical Bank,* 668 F.2d 654 (2d Cir.1982), an employment discrimination class action where the complaint was filed on December 24, 1980, defendant filed a general denial on February 4, 1981, and on February 10 plaintiffs' counsel presented the trial court with a proposed class certification and settlement decree. Judge Conner rejected the settlement on the basis of that virtually nonexistent record. The Second Circuit affirmed, expressing a concern reiterated in *Weinberger, supra,* at 73 that such a procedure gives rise to "possibilities of collusion or of undue pressure by the defendants on would-be class representatives." *Weinberger* makes it clear that, despite these concerns, there is no *per se* rule prohibiting approval of such settlements; but the Second Circuit demands "a clearer

showing of a settlement's fairness, reasonableness and adequacy and the propriety of negotiations leading to it in such cases than where a class has been certified and class representatives have been recognized at an earlier date." *Ibid.*[4]

■ Another principle is that the Court cannot modify the fundamental terms of a settlement proposal; as a general rule, it can only accept or reject the proposal as presented to it. Memorandum Opinion of December 16, 1981 at slip op. 3 and cases cited; *see also Alliance to End Repression v. City of Chicago, supra,* 91 F.R.D. at 195.

A final and most important criterion is the state of existing law. In the case at bar, the complaint paints a picture of secretive, unrestrained unconstitutional activity on the part of the NYPD. The proposed settlement and guidelines, as we have seen, generally affirm constitutional rights and privileges; place specific limits and restraints on intelligence gathering activities; require detailed documentation subject to public view; establish a reviewing authority with a civilian member; and place these procedures within the framework of this Court's injunctive order, with the concomitant threat of contempt for non-compliance.

*Prima facie,* such a settlement appears to achieve something of value for the class. But objectors say it does not. On the contrary: they contend that if the settlement received judicial sanction, it will make the situation worse, not better. The argument is summarized in objectors' main brief at 53: "This proposed settlement and guidelines are totally inconsistent with First Amendment principles; rather than securing protection of First Amendment rights, the guidelines legitimize conduct which is an anathema to the First Amendment."

Objectors raise a vital point. Judge Getzendanner's meticulous opinion in *Alliance to End Repression v. City of Chicago, supra,* properly observes at 91 F.R.D. 204:

"A fair settlement may not initiate or authorize any illegal conduct." But she then qualifies that general observation:

"However, the Court must not decide unsettled legal questions. Any illegality or unconstitutionality must appear 'as a legal certainty on the face of the agreement.' Further, the conduct must be illegal 'as a general rule,' according to the state of the law at the time the settlement is presented to the District Court for approval. *Armstrong,* 616 F.2d at 319–322."
*Ibid.*

The rule is the same in the Second Circuit. *Robertson v. National Basketball Association,* 556 F.2d 682 (2d Cir.1977), and see discussion under Point VI, *infra.*

■ Just as the illegality or unconstitutionality of settlement-sanctioned conduct depends on the state of the law at the time of settlement, so does measurement of the settlement's achievements against the Court's equity power; it is the other side of the coin. One must determine by present law what police conduct is illegal, and what limitations exist on an equity court's power to direct police conduct. These are the only realistic criteria in evaluating this settlement. It is beside the point for objectors to posit constitutional restraints on police conduct as they would prefer them to be, and then criticize the settlement because it falls short of a state of law they devoutly desire but have not yet achieved.

Evaluation of the proposed settlement within the context of present law is the substantive issue in this case. But before addressing that issue, I must consider objectors' procedural contention that a sufficient factual background has not been developed through pre-trial discovery.

## IV.

### The Factual Basis for the Settlement

Objectors, relying primarily upon *Plummer v. Chemical Bank, supra,* contend

---

**4.** I dwell upon *Plummer v. Chemical Bank,* as explicated in *Weinberger v. Kendrick,* at some length because of the heavy emphasis the present objectors lay upon *Plummer.* However, for the reasons appearing in Point IV, *infra,* that reliance is misplaced.

that the facts of the case have not been sufficiently developed. That perceived insufficiency is said to reveal the inadequacy of class representation, and to deprive the Court of a proper basis for evaluating the settlement.

*Plummer* is inapposite. That case generated absolutely no record by which plaintiffs' claims of employment discrimination could be tested. The defendant bank's only declaration was an answer denying all wrongdoing. No other sources of information existed to shed light upon defendant's possible illegalities. The case at bar stands in quite a different posture.

It is true that the present defendants' first pleading was a general denial. But their motion to dismiss the complaint, denied by Judge Weinfeld, generated a considerable record, including a lengthy affidavit by then Police Commissioner Patrick V. Murphy. Commissioner Murphy traced the origin of the SSD (predecessor unit of the PSS) back to an "Italian Squad" formed in 1904 to curtail the illegal activities of a group of Italian immigrants called the "Black Hand Society." Murphy's affidavit acknowledged the following facts:

(1) Political unrest in the 1960's, including protests over the Indo-China war, prompted an increase of SSD investigations.

(2) These investigations included more undercover and other surveillance of "groups that because of their conduct or rhetoric may pose a threat to life, property, or governmental administration"; of "malcontents"; and of "groups or individuals whose purpose is the disruption of governmental activities for the peace and harmony of the community."

(3) The SSD gathered intelligence by means of infiltrations and informers, and telephone wiretapping, electronic eavesdropping, surreptitious recording of conversations, covert photography of individuals attending demonstrations, and re-cording speeches at demonstrations. This intelligence gathering was *not* limited to investigations of crime, but related to any activity likely to result in "a serious police problem."

(4) SSD tactics had included the issuance of false working press credentials to its officers.

(5) The SSD routinely furnished information about individuals signing petitions or attending meetings to the Committee on Character and Fitness of the New York State Supreme Court-Appellate Division.

In short, class counsel are correct in saying that "Commissioner Murphy conceded that the Police Department was engaged in the vast bulk of activities described in the complaint, including surreptitious surveillance and undercover infiltration of the political activities of individuals and groups." [5]

The fact that the Police Commissioner coupled these concessions with disclaimers of illegality does not diminish the insights they gave into NYPD activity. They raise—if one may use the phrase—an unmistakable red flag of potential, if not actual, constitutional violations. And the Murphy affidavit distinguishes this case from *Plummer*, where Chemical Bank did not say what it was doing, and Judge Conner had no way of finding out.

Defendants' motion to dismiss the complaint was also supported by affidavits of Alan F. London, Esq., then counsel, and John L. Keenan, the NYPD's Chief of Inspectional Services and overall SSD commander. Comparable revelations appear in these, including admissions of activities involving certain plaintiffs specifically alleged in the complaint.[6]

Class counsel also obtained through discovery a set of guidelines unilaterally promulgated by Commissioner Murphy in 1973, during the pendency of this action.[7] These guidelines, while stating in general and precatory terms that constitutional

---

5. Affidavit of Jethro M. Eisenstein, Esq., verified January 11, 1984, at ¶ 34.

6. The London and Keenan affidavits are further described in the Eisenstein affidavit at ¶¶ 35–43.

7. "Procedure-Public Security Activities of the Intelligence Division," Ex. B to Eisenstein affidavit.

rights are important, do not contain the specific limitations, reporting requirements, and review procedures contemplated by the proposed settlement.[8] To the extent that the 1973 guidelines are anything other than the NYPD's self-serving declaration with an eye toward pending litigation, they are a source of information revelatory of broader intelligence gathering practices than the settlement's guidelines would tolerate.

The 1973 SSD guidelines were unearthed by interrogatories, a species of "formal" discovery. Contrary to the impression at times conveyed by the objectors, class counsel did not eschew formal discovery entirely. In 1973 and 1974 they deposed the commanding officer of the SSD and his principal subordinates, and developed further information by series of interrogatories resulting in some document production. Objectors dismiss this discovery as being "directed towards one issue and one issue only, facts bearing upon the appropriateness of the proposed class and whether or not there should be a class certification."[9] It is true that discovery at that time addressed class certification, under the discovery order of Judge Stewart, who then had the case in charge. But procedural bulkheads are not watertight. A fact once let loose, for whatever procedural purpose, is free to run about the world, telling its tale to whoever will listen for whatever purpose. And this discovery, while directed toward the class certification which ultimately issued, inevitably overlapped with proof on the merits of the claims. That is the exception, not the rule, in class action litigation. It is easier for a trial judge to say in principle that discovery will be concerned only with "certification" and not

with "the merits" than it is to enforce the distinction in practice. The fact is that formal discovery in this case developed significant information concerning the scope and nature of SSD activities, from which reasonable inferences could be drawn concerning the strength of plaintiffs' claims.[10]

Class counsel also had available to them revelations arising from the celebrated case of *People v. Collier*, 85 Misc.2d 529, 376 N.Y.S.2d 954 (N.Y.Cty.1975). The record in that litigation revealed that in the 1970's, even in derogation of the limited internal guidelines promulgated in 1973, the SSD "engaged in long-term undercover operations, targeted against community activists, with no factual predicate for any belief that criminal activity was afloat," with the result, *inter alia*, that many individuals "became the subjects of Intelligence Division files simply because of their attendance at and participation in political activities."[11]

The activities of the SSD and its predecessor agencies during the 1960's and early 1970's were the subject of three studies which class counsel considered. These were *The Operations of a Police Intelligence Unit*, dated February 1968, a CUNY master's thesis authored by Anthony V. Bouza, a former NYPD official assigned for eight years to the Bureau of Special Services, SSD's predecessor unit; and two books prompted by the trial and acquittal of the "Black Panther 21" in May 1971: Peter L. Zimroth, *Perversions of Justice: The Prosecution and Acquittal of the Panther 21* (Viking 1974),[12] and Paul G. Chevigny, *Cops and Rebels* (Pantheon, 1972).[13]

---

**8.** The 1973 guidelines are considered in greater detail in the Eisenstein affidavit at ¶¶ 44–47.

**9.** Affidavit of Marshall Perlin, Esq., verified March 19, 1984, at ¶ 20.

**10.** The fruits of this discovery are summarized in the Eisenstein affidavit at ¶¶ 58–63.

**11.** Eisenstein affidavit at ¶ 56. Class counsel's further inquiries into the *Collier* record are described at ¶¶ 49–55.

**12.** Zimroth, a trial attorney now in private practice, was for a number of years a top assistant to New York County District Attorney Robert Morgenthau.

**13.** Chevigny is currently a professor of law at New York University Law School. He has been one of plaintiffs' counsel in this action since its inception. Chevigny's most recent writing in the field is *Politics and Law in the Control of Local Surveillance,* 69 Cornell L.Rev. 735 (1984) (hereafter cited as "Chevigny article").

The decades of the sixties and seventies were periods of heightened American public awareness of political unrest and law enforcement response. Thus only six years separate the *Report of the National Advisory Commission on Civil Disorders 269* (1968) (The "Kerner Report"), which advocated police intelligence units using undercovers and informers "to gather ... and disseminate information on potential as well as actual civil disorders," from the *Final Report of the Select Committee to Study Governmental Operations with Respect to Intelligence Activities*, S.Rep. No. 755, 94th Cong., 2d Sess. (1976) (the "Church Committee Report"), which described First Amendment abuses of federal agents, charges which were then levelled against a number of local police forces.[14]

In the light of all this source material, specific and more generalized, it is disingenuous for objectors to say (main brief at 3–4) that "the Court is called upon to pass upon the propriety of a settlement in a total vacuum" because the record consists of "merely a complaint alleging police abuse" and "an answer denying every one of the allegations of the complaint...." That may accurately describe the record in *Plummer v. Chemical Bank, supra*. It is not a fair or accurate description of the record in this case.

Objectors state correctly that more extensive formal discovery took place in two comparable cases which resulted in court-approved settlements. These are the class actions against the Chicago police[15] and the Los Angeles police.[16] The distinction is significant only if there is a set minimum requirement of "formal" discovery before a settlement can be approved. But that is not the law, as noted under Point III, *supra*. What counts is knowledge of the case, not the particular source of that knowledge.

■ Implicit in objectors' argument is the proposition that discovery should have proceeded to the point where plaintiffs' claims were fully established by formal proof. Thus objectors perceive a "compelling need for discovery now as to the grievances that caused this action to be brought and could be continuing with equal force to the present time." Absent such discovery, the argument proceeds, the proposed settlement would guarantee "that the class would remain uninformed and the charged misdeeds of the defendants would remain covered up and secret."[17] Similarly, it is argued by counsel for an individual objector, Richard Dhoruba Moore, that "[h]aving been denied discovery, members of the plaintiff class will never know the extent to which their own arrests by the NYPD were part of an illegal and/or unconstitutional campaign to disrupt their political activities."[18] The thrust of these arguments is that formal discovery should be carried forward to the point where defendants are obliged to admit their wrongdoings, or be subject to a successful motion for summary judgment.

I reject the argument because it is inconsistent with the salutary purposes of settlement. For precisely that reason, Judge Getzendanner rejected comparable objections in *Alliance to End Repression v. City of Chicago, supra*, at 91 F.R.D. 201:

"Some objectors argue that both settlement agreements are fatally defective because they lack more extensive admissions or finding of wrongdoing by the Court. As the Court stated at the March 13 hearing:

'Well, certainly the whole purpose of the settlement is to avoid adjudication with respect to the activity which is the basis of the complaint. I think the

---

**14.** See Chevigny article at 736–37.

**15.** *Alliance to End Repression, supra*.

**16.** *Coalition Against Police Abuse v. Board of Police Commissioners*, Nos. C 243458, C 317528, C 374660, C 381338, C 399552, C 413904 (Sup.Ct. Calif., L.A.Cty.1984) (not officially reported).

**17.** Perlin affidavit at ¶¶ 19, 24.

**18.** Affidavit of Robert J. Boyle, Esq., verified June 5, 1984, at ¶ 10.

parties would be stunned if in submitting a class action settlement to the Court, the Court started to decide the issues. That's why people enter into settlements and I am not going to interfere in the settlement process.'"

The same judge expressed the same views, with which I agree, at 561 F.Supp. 554:

"Some objectors argue that both the City of Chicago and the Department of Defense Settlements make no findings and contain no admissions of wrongdoing by the City of Chicago, the Department of Defense, or their agents. But the essential purpose of a settlement is to avoid adjudication of the lawfulness or propriety of conduct which is the subject of allegations of the complaint. It would defeat an important purpose of settlement, and therefore render settlements less attractive to the parties, if the settlement agreement were required to include admissions of wrongdoing by the defendants, or if the .Court itself made such findings in connection with a proposed settlement. Such a procedure would constitute an unwarranted interference by the Court in the efforts of the parties to resolve their differences short of adjudication of the allegations of the complaint."

One senses, in the objections at bar, a passionate desire by the objectors that whatever illegalities the NYPD perpetrated in earlier years be exposed to the light of day by a full plenary record. It is easy enough to understand that desire in human terms. But it is absolutely inconsistent with the salutary purpose of class action settlements.

■ In the case at bar, the information, both specific and general, summarized above placed class counsel in a position to make intelligent judgments concerning (a) the constitutional abuses of which a large metropolitan police force was capable; (b) the fact of such abuses by the NYPD; and (c) the prospect of obtaining injunctive relief, in the light of presently existing law: a factor to which I will shortly come. That information guided class counsel in recommending the proposed settlement; it is equally available to the Court in evaluating settlement. I reject the argument that an insufficient basis exists, for either that recommendation or evaluation.

## V.

### The Role of Existing Law in Evaluating the Settlement

I will now examine in greater detail a particularly significant criterion in evaluating this settlement: existing constitutional law.

■ As noted under Point III *supra,* existing law is of primary importance in evaluating a settlement. This settlement imposes prior limitations and restraints upon police action. An equity court's power to do that is itself significantly limited by present caselaw.

As for the use of undercover agents and informers, Judge Weinfeld in the case at bar said this:

"The use of secret informers or undercover agents is a legitimate and proper practice of law enforcement and justified in the public interest—indeed, without the use of such agents many crimes would go unpunished and wrongdoers escape prosecution. It is a technique that has frequently been used to prevent serious crimes of a cataclysmic nature. The use of informers and infiltrators by itself does not give rise to any claim of violation of constitutional rights."

349 F.Supp. at 769 (footnotes omitted).

Judge Weinfeld cited and followed *Laird v. Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), where the Supreme Court considered a First Amendment challenge to the Army's system of political surveillance. That system, which included gathering of information by undercover attendants at public meetings, reference to local police records and published sources, and alleged use of informers and infiltrators, generated files and dossiers allegedly for the purpose of facilitating contingency planning and assisting local authorities in

civil disorders. The Court held that the collection by authorities of information by lawful means for lawful purposes caused no injury and hence did not give rise to a justiciable case. That is so, notwithstanding any implied intimidation, threat or "chilling" effect experienced by those subjected to surveillance.

Consistent with that principle, the Second Circuit has held that the attendance of law enforcement officers at public gatherings is not actionable. *Fifth Avenue Peace Parade Committee v. Gray,* 480 F.2d 326 (2d Cir.1973) (following *Laird v. Tatum,* no justiciable controversy arose out of FBI's investigation into who would attend war protest demonstration, surveillance of gathering, and dissemination of resulting information). In *Socialist Workers Party v. Attorney General,* 510 F.2d 253 (2d Cir. 1974), the Second Circuit reversed this Court's injunction restraining FBI agents or confidential informants from "attending, surveilling, listening to, watching, or in any way monitoring" the annual convention of the Young Socialist Alliance. 510 F.2d at 254. Rejecting the plaintiffs' reliance upon such cases as *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), on the ground that they "did not involve the judiciary in exercising prior restraints on an investigative agency in the executive or legislative branch," *id.* at 255, the Second Circuit cited Judge Weinfeld's above-quoted observation in *Handschu* for the proposition that:

> "The FBI has a right, indeed a duty, to keep itself informed with respect to the possible commission of crimes; it is not obliged to wear blinders until it may be too late for prevention."

And in *Philadelphia Yearly Meeting Religious Society of Friends v. Tate,* 519 F.2d 1335 (3rd Cir.1975), the Third Circuit, distinguishing between the dissemination of intelligence files to law enforcement agencies as opposed to members of the public, held that allegations of "sharing the information with other law enforcement agencies fail to state a claim upon which relief can be granted." *Id.* at 1338.

It is equally true, under these and other cases, that public authorities may not collect information by unconstitutional means for unconstitutional purposes. The objectors focus upon Judge Weinfeld's concluding observation in *Handschu* that:

> "... if in fact there were any such 'aberrations' which amounted to a pattern of unconstitutional conduct, of which the defendants should have been aware, plaintiffs would be entitled to injunctive relief to prevent a continuance thereof."

349 F.Supp. at 771.

Judge Weinfeld, writing in 1972, cited *Schnell v. City of Chicago,* 407 F.2d 1084, 1086 (7th Cir.1969) for the availability of equitable relief. *Schnell* arose out of the unruly Democratic National Convention in Chicago in 1968. The plaintiff class consisted of news photographers who claimed that the Chicago police interfered with their constitutional right to gather and report news, and to photograph news events. Plaintiffs sought an order directing the police superintendent to take appropriate action, including the issuance of proper rules and regulations, to prevent such constitutional violations. Reversing the district court's dismissal of the complaint, the Seventh Circuit held:

> "If the injuries which allegedly predated the filing of the complaint and which allegedly will reoccur at a future time are established at trial, the district court would be warranted in granting some form of the relief requested."

407 F.2d at 1086.

But *Schnell*'s precedential value is severely undermined by *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), which the Supreme Court decided seven years later. In *Rizzo,* unconstitutional abuses by the Philadelphia police department were demonstrated at trial, and the district court fashioned a detailed injunctive decree. The Third Circuit affirmed. 506 F.2d 542. The Supreme Court, reversing, vacated the injunction because in its view the judgment of the district court constituted an unwarranted federal judicial intrusion into the discretionary

authority of the police to perform their official functions as prescribed by state and local law.

The relevant portion of the Court's opinion, 423 U.S. 377–81, 96 S.Ct. 607–09, begins with a rejection of the plaintiffs' "novel claim" of "the citizenry's 'right' to be protected from unconstitutional exercises of police power, and the 'need for protection from such abuses', giving rise to 'a right to mandatory equitable relief in some form when those in supervisory positions do not institute steps to reduce the incidents of unconstitutional police misconduct.'" *Id.* at 377–78, 96 S.Ct. at 607. As Justice Rehnquist paraphrased plaintiffs' argument: "The scope of federal equity power should be extended to the fashioning of prophylactic procedures for a state agency designed to minimize this kind of misconduct on the part of a handful of its employees." The Court rejected that argument for two reasons. First, it violated "the settled rule that in federal equity cases 'the nature of the violation determines the scope of the remedy.'" *Ibid.* Secondly, "important considerations of federalism are additional factors weighing against it." "[E]ven within a unitary court system," the Court continued, "government has traditionally been granted the widest latitude in the dispatch of its own internal affairs. Thus the district court's injunctive order, 'significantly revising the internal procedures of the Philadelphia police department, was indisputably a sharp limitation on the department's latitude in the dispatch of its own internal affairs.'" *Id.* at 379, 96 S.Ct. at 608. The concept of comity, rooted in federalism, creates an additional obstacle when a federal court is asked to enjoin the actions of state or local authorities. Then, "the principles of equity ... militate heavily against the grant of an injunction except in the most extraordinary circumstances." *Id.* at 379, 96 S.Ct. at 608. And those principles, the Court went on in *Rizzo*, "likewise have applicability where injunctive relief is sought, not against the judicial branch of the state government, but against those in charge of an executive branch of an agency or of state or local governments such as petitioners here." Condemning the district court's injunction, the Court concluded its opinion in *Rizzo* by saying:

"When it injected itself by injunctive decree into the internal disciplinary affairs of this state agency, the District Court departed from these precepts."

*Id.* at 380, 96 S.Ct. at 609.

The present objectors never really come to grips with the threat posed by *Rizzo v. Goode* to plaintiff class. The threat (and it is substantial) is that class plaintiffs, as the result of prolonged formal discovery or a full plenary trial, may prove all their claims of abuse on the part of the NYPD, and still have broad form, future mandatory injunctive relief denied them on the ground that a federal equity court cannot intrude to that degree into the discretionary activities of state or local authorities. Equitable remedies, on such an analysis, would be limited to particular showings of particular constitutional deprivations, with more individualized and less prospective relief. Such a case is *Local 1814, International Longshoremen's Association, AFL–CIO v. Waterfront Commission of New York Harbor,* 667 F.2d 267 (2d Cir.1981), discussed in greater detail *infra.*

Concededly, it is possible to give *Rizzo* a narrower reading. The Court focused, in the earlier portion of its opinion, upon the district court's finding that "the evidence did not establish the existence of any policy on the part" of the supervisory dependents "to violate the legal and constitutional rights of the plaintiff classes," 423 U.S. at 368, 96 S.Ct. at 603, so that plaintiffs' claims of future injury rested "not upon what the named [defendants] might do to them in the future," but upon "what one of a small, unnamed minority of policemen might do to them in the future because of that unknown policeman's perception of departmental disciplinary procedures." *Id.* at 372, 96 S.Ct. at 605. But *Rizzo* is certainly subject to that far broader interpretation articulated in the opinion's closing section: an interpretation which (while I express no final opinion on the matter) is clearly of

sufficient plausibility to erect a formidable potential legal obstacle to the ultimate relief which the present objectors insist the class is entitled to receive. Judge Getzendanner, approving the class action settlement in the suit against the City of Chicago and certain Department of Defense defendants, *Alliance to End Repression v. City of Chicago,* 561 F.Supp. 537 (N.D.Ill.1982), recognized just that obstacle when she wrote at 551:

"Also, there was the risk that even if the plaintiffs prevailed on the merits, and their claims for injunctive relief were held not moot, the Court might nonetheless decline to issue an injunction, or might issue an injunction less protective of their rights than the provisions of the proposed settlement. The City of Chicago defendants have made plain their intention to contend at trial that the Chicago Police Department should not be run by injunction. See, *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1961)."

*See also, Alliance to End Repression v. City of Chicago,* 91 F.R.D. 182, 198 (N.D. Ill.1981) (companion class action against the FBI, Justice Department, CIA and certain individual defendants; comparable risk of denial of injunctive relief expressed, the FBI and Justice Department defendants having "made plain their intention to contend at trial that 'the FBI simply should not be run by traditional injunction,' for both 'public policy and legal reasons.' ").

In their attack upon the constitutionality of the proposed settlement, objectors lay great stress (at oral argument and in a final post-argument brief) upon *Local 1814, International Longshoremen's Association, AFL–CIO v. Waterfront Commission of New York Harbor, supra.* The majority opinion in *Local 1814* is said to lay down broad constitutional principles which apply to the prior judicial restraint of police activities contemplated by the settlement.

I do not agree. *Local 1814* presented the issue of compelled disclosure of contributions to a union's political action fund. The case was governed by *NAACP v. Alabama, supra,* and its progeny. The Waterfront Commission, a bistate agency created to investigate and eliminate corruption on the waterfront in the Port of New York, had reason to believe that the union was coercing members to authorize contributions to its political action fund by payroll deduction. The Commission wished to ascertain the extent of the coercive practices, but preferred not to question all 4000 longshoremen involved. Instead it issued a subpoena to the New York Shipping Association ("NYSA"), the administrator of the collective bargaining agreement, seeking to compel the disclosure of the names of the 450 longshoremen who signed payroll deduction authorizations after January 1, 1979 (that being the date on which the union accelerated its efforts to obtain contributions by deductions). Local 1814 and the Fund sued to enjoin the enforcement of the subpoena, "contending that disclosure of the contributors' names by defendant NYSA to the Commission would result in an unconstitutional chilling effect upon the union members' political and associational First Amendment rights." 667 F.2d at 270.

The district judge found a likely chilling effect in disclosure, but also recognized that disclosure was reasonably related to the compelling state interest of fighting crime on the waterfront. He struck the balance by limiting the subpoena to 45 randomly selected longshoremen. The Second Circuit affirmed, the panel majority remarking that the Commission could apply for further disclosure if it felt the need "after the testimony of the first 45 contributors." *Id.* at 274. The concurring judge would have permitted enforcement of the subpoena "without the 10% limitation imposed by the District Court." *Ibid.*

The present objectors find particular comfort in Judge Newman's statement for the majority that the significant relationship between disclosure and the achievement of a compelling governmental interest "does not end our inquiry, however, for we must still examine the scope of the proposed action." *Id.* at 273. The opinion then cites and quotes *Shelton v. Tucker,*

364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960):

"[E]ven though the governmental purpose [assuring teacher competence] be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved."

*Shelton v. Tucker* struck down a state law requiring the teachers of Arkansas to disclose all organizations to which they belonged as violative of the Fourteenth Amendment. The Court regarded the "unlimited and indiscriminate sweep of the statute," 364 U.S. at 490, 81 S.Ct. at 253, to bring it within the ban of earlier cases as *Lovell v. Griffin*, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938) (invalidating an ordinance prohibiting all distribution of literature at any time or place without a license); *Schneider v. State*, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939) (invalidating ordinances which banned or imposed prior restraints upon the distribution of handbills); and *Talley v. California*, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960) (to the same effect). See 364 U.S. at 488–89, 81 S.Ct. at 252–53.

I do not find *Local 1814* and its antecedents particularly instructive in the case at bar, which turns not upon individualized government action in particular circumstances, but rather upon the permissible extent under existing law of broad, prior judicial restraint of future police intelligence gathering implicating a large class. I do not believe that the Second Circuit's intent in *Local 1814* was to reverse its opinion in *Socialist Workers Party v. Attorney General, supra, sub silentio*; nor would *Rizzo v. Goode, supra,* favor that objective even if the *Local 1814* court had it in mind.

In short, under existing law certain police intelligence-gathering activities of which the objectors disapprove are not prohibited; and substantial doubt exists as to a federal equity court's power to enjoin future conduct, even if arguably illegal.

These considerations play an important part in evaluating the proposed settlement.

\* \* \* \* \* \*

In the following several Points, I consider those specific objections of sufficient substance to require discussion.

### VI.

*Whether the Settlement Initiates or Authorizes Illegal Conduct*

Objectors contend that the Guidelines "legitimize conduct which is an anathema to the First Amendment."

We have already seen that existing law generally determines the propriety of the settlement, Point III, *supra*; and that the settlement imposes significant limitations on police information gathering that present law would not require, Point V, *supra.*

But objectors press the point, although their specific criticism was not fully fleshed out until their reply brief. It is there argued that the Guidelines sanction violations of "First Amendment rights to organizational integrity and autonomy" as declared in *Democratic Party of the United States v. LaFollette*, 450 U.S. 107, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981). Reply brief, Point I. Secondly, the Guidelines are said to fail to adequately protect "the common law and First Amendment right to privacy and the common law right to be free from trespass," citing *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), *Birnbaum v. United States*, 588 F.2d 319 (2d Cir.1978), and other cases. *Id.,* Point II. The use of informers and undercover agents lies at the heart of both concerns. The issue is whether objectors' concerns are justified by existing law.

In *LaFollette* the Supreme Court resolved a tension between the rules of the national Democratic Party and the Wisconsin election laws. The party's rules provided that only those who were willing to affiliate publicly with the Democratic Party might participate in its National Convention. Wisconsin election laws allowed voters to participate in its Democratic Presi-

dential candidate preference primary without regard to party affiliation and without requiring a public declaration of party preference. State law also mandated that delegates to the Convention, although separately chosen, must vote at the Convention in accord with the results of the open primary election: hence the conflict between state election law and national party rules. The Court held that Wisconsin could not constitutionally compel the national party to seat a delegation chosen in a way that violated the party's rules. Its opinion recognizes that the "First Amendment freedom to gather in association for the purpose of advancing shared beliefs is protected by the Fourteenth Amendment from infringement by any State," and that such freedom of association "necessarily presupposes the freedom to identify the people who constitute the association, and to limit the association to those people only." 450 U.S. at 121–22, 101 S.Ct. at 1019.

*LaFollette* is consistent, objectors say, with *NAACP v. Alabama, supra,* which struck down an Alabama statute requiring the NAACP, in order to qualify as a foreign corporation to do business in the state, to reveal to the state attorney general the names and addresses of all its Alabama members and agents. The Court concluded that compelled disclosure of membership entailed "the likelihood of a substantial restraint upon the exercise by petitioner's members of their right to freedom of association." 357 U.S. at 462, 78 S.Ct. at 1172.

The objectors seek to apply the constitutional principles derived from these cases in criticizing the Guidelines' provisions for the use of undercover agents, informers and investigators.

It will be recalled that investigators can attend public activities of political organizations, but only if an investigation statement is filed with the Authority reciting "specific information" of criminal activity. Undercover personnel in such criminal investigations must be approved by the Authority in advance, on a finding, *inter alia,* that "the

use of undercover personnel is essential to develop information about the activities of the person, group or organization under investigation." "Essential" in this context clearly requires a showing that less intrusive methods are not adequate to the task. The adjective is different from "useful," "helpful," or "desirable."

It is doubtful, to say the least, whether the holdings in *LaFollette* and *NAACP v. Alabama* have any bearing upon an organization's right to prior judicial restraint of police undercover presence when possible criminal activity is being investigated. Neither case undertakes to address that question; criminal law enforcement agencies were not involved. And we have seen that the Second Circuit in *Socialist Workers Party v. Attorney General, supra,* refusing to enjoin the presence of FBI agents and informers at the Young Socialist Alliance Convention, specifically distinguished *NAACP v. Alabama* and its progeny on the ground that they "did not involve the judiciary in exercising prior restraints on an investigative agency," 510 F.2d at 255.

Until appellate caselaw extends the constitutional principles declared in *LaFollette* and *NAACP v. Alabama* to prior restraints of law enforcement criminal investigations—and that has not happened yet—it cannot fairly be said that the proposed NYPD guidelines sanction unconstitutional behavior. That is so even if, as objectors correctly point out, the present Guidelines do not specifically prohibit particular acts by undercovers, such as sex with members of target groups or assuming leadership positions in a target organization. The Los Angeles guidelines contain such specific prohibitions, § IV.D.3.(j); the Chicago and New York guidelines do not. This proves that the settlements are not identical, and that, in this respect at least, the Los Angeles defendants were more amenable to specific limitations than the other two cities. It hardly demonstrates that the present settlement sanctions conduct which is unconstitutional *under existing law.*[19]

**19.** The effect of possible future changes in caselaw upon the settlement and its guidelines is discussed *infra* under this Point and also under Point VII.

So too with objectors' claimed loss of state law right of privacy. In *Birnbaum v. United States, supra,* the Second Circuit construed New York law and concluded that the CIA's opening and reading of first class mail which American citizens sent to or received from the Soviet Union, sometimes because the FBI had indicated a "security interest" in the individual or organization, sometimes simply at random, created a cause of action for intrusion upon privacy. In *Socialist Workers Party v. Attorney General,* 463 F.Supp. 515, 524–25 (S.D.N.Y.1978), also relied upon by objectors, Judge Griesa cited *Birnbaum* in denying a motion to dismiss a complaint alleging comparable intrusions by the FBI. Neither case involved a police investigation triggered by specific information of criminal conduct; nor do objectors' other state law cases do so. There is, in short, a comparable paucity of authority in objectors' briefs to establish that the proposed Guidelines violate *existing* common law rights.

That lack of authority, constitutional and common law, is fatal to the present objections, because "before a settlement may be rejected because it initiates or authorizes a clearly illegal or unconstitutional practice, prior judicial decisions must have found that practice to be illegal or unconstitutional as a general rule." *Armstrong v. Board of School Directors of the City of Milwaukee,* 616 F.2d 305, 321 (7th Cir. 1980). In *Robertson v. National Basketball Association, supra,* the Second Circuit stated generally:

"It is true that a settlement that authorizes the continuation of clearly illegal conduct cannot be approved, but a court in approving a settlement should not in effect try the case by deciding unsettled

legal questions. *West Virginia v. Chas. Pfizer & Co.,* 440 F.2d 1079, 1086 (2d Cir.), *cert. denied,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971). Here, as in *Grunin v. International House of Pancakes,* 513 F.2d 114, 124 (8th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975), 'the alleged illegality of the settlement agreement is not a legal certainty.' The challenged practices have not been held to be illegal per se in any previously decided case."

556 F.2d at 686.

The circumstances are the same in the case at bar.[20]

A related concern is the effect of possible changes in the law upon the settlement and its procedures. That is to say: what if objectors' counsel, or colleagues elsewhere, succeed in future cases in persuading circuit courts or the Supreme Court to change existing law, so that it more closely conforms to counsel's present views? Objectors suggest that, at least in New York City, the settlement would stifle such change, denying to class members by its leaden, deadening hand the benefit of newly declared constitutional principles.

There is no substance to this concern. With respect to future developments in the law, the settlement is flexible, not cast in concrete until the end of the world. That flexibility finds explicit expression in the first sentence of the General Statement of Policy prefacing the Guidelines that activities of the PSS "will conform to constitutionally guaranteed rights and privileges." The second sentence of the policy statement, providing that collection, retention and dissemination of information shall occur "only in accordance with the provisions" of the Guidelines, is sublimated to

---

**20.** Furthermore, in evaluating the conflicting demands of individual freedom and public order in a constitutional context, the court is entitled, without abdicating its own responsibility, "to rely heavily upon the opinion of competent counsel." *Armstrong, supra,* at 325. In the instant case, the competence of Professor Chevigny and his colleagues in constitutional law is manifest. Of course, counsel for the objectors are also competent; they have for years been in

the forefront of civil rights litigation. Since equally competent counsel take diametrically opposite constitutional positions, it would perhaps be an exaggeration to say, in *Armstrong*'s phrase, that I "rely heavily" on the opinion of class counsel. But I accept their opinion because my own research confirms it: particularly the lack of "any previously decided case" which holds the settlement practices "to be illegal per se." *Robertson, supra.*

the general policy declaration of the first. This subordination of the Guidelines to the Constitution as interpreted by the courts finds further expression in paragraph 5, which declares that the Authority "shall not be a substitute for any prior judicial screening required by law." And just as constitutional law is an evolving body of authority, never fixed in concrete for ever and a day, so the procedures established by this settlement, subordinate to the Constitution, necessarily contain within them both the obligation and the ability to adjust to change. If future cases declare "constitutionally guaranteed rights and privileges" which do not presently exist, the Guidelines are automatically amended *pro tanto*. And if controversy arises as to the existence or extent of such amendments, this Court retains jurisdiction "to modify or amend the decree to account for changed circumstances," *Equal Employment Opportunity Commission v. Children's Hospital Medical Center of Northern California*, 719 F.2d at 1426, citing and quoting *United States v. Swift & Co.*, 286 U.S. 106, 114–15, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932).

In sum, I find no substance to the objection that the settlement initiates or authorizes illegal conduct.

## VII.

*Effect of the Settlement Upon Past and Future Claims*

Objectors complain of the perceived effect of the settlement upon past and future claims of class members. The pertinent provisions of the settlement are found in paragraph 7 of the Stipulation, which for convenience I will set forth again:

"This stipulation constitutes a full and final adjudication with respect to the claims of the plaintiff class for injunctive and declaratory relief as stated in the complaint. Any claim based solely upon the collection and/or retention of information about a person or an organization by the New York City Police Department is also settled by this stipulation."

The objectors regard these provisions as illegal and improper for two separate reasons. In respect of the settlement of past claims, they point to two separate lawsuits pending in this Court, "both seeking substantial money damages, which allege abuses far beyond those remedied by the proposed settlement." Main brief at 24. These cases are *National Lawyers Guild v. Attorney General*, 77 Civ. 999 (CLB), and *Moore v. Kelly*, 75 Civ. 6203 (MJL).

I perceive no prejudice to these litigants if the proposed settlement is approved. The Stipulation constitutes an adjudication of "the claims of the plaintiff class for injunctive and declaratory relief as stated in the complaint." Assuming that the plaintiffs in *National Lawyers Guild* and *Moore* can establish constitutional violations, their claims for money damages, with one *caveat*, are not affected by the settlement.

That *caveat* relates to claims for damages "based *solely* upon the collection and/or retention of information" (emphasis added), which are also disposed of by the settlement. That language conforms to the present state of law declared in *Laird v. Tatum, supra*, and its progeny. The question is dealt with in defendants' answers to one of objectors' interrogatories, promulgated to clarify any ambiguities in the settlement. Interrogatory No. 22 inquires:

"Does paragraph 7 mean that only claims for past damages are settled by this stipulation. Is it intended to apply to putative claims for damages of which the plaintiff is not aware of [sic] at this time even though the conduct giving rise to such claim occurred in the past?"

In their amended responses to interrogatories, defendants answered thus:

"Yes. Paragraph 7 settles, *inter alia*, all claims for damages based solely upon the collection and/or retention of information about a person or an organization by the New York City Police Department where that collection and/or retention preceded the effective date of the Stipulation even if the collection and/or reten-

tion was unknown to the subject person or group. Paragraph 7 does not settle claims for damages for illegal methods or collection, such as warrantless searches where warrants are required, or thefts or wiretaps in violation of law. See *Laird v. Tatum*, 408 U.S. 1 [92 S.Ct. 2318, 33 L.Ed.2d 154] (1972)."

This response makes two points clear. The first is that only claims for which *Laird v. Tatum* declares there is no presently existing remedy are released. To the extent that the plaintiffs in *National Lawyers Guild* and *Moore* (or any other class members) can prove money damages caused by conduct for which existing law gives them a remedy, the settlement affects them not at all.

Secondly, even as to claims barred by *Laird v. Tatum*, the settlement speaks only as to collection or retention of information preceding the effective date of the settlement. Future claims are not covered; thus if in later cases the views of the *Laird* minority prevail, nothing in this settlement would bar resulting claims.[21]

This leads to a more general consideration of future claims. Objectors' other expressed concern is for the effect of the settlement upon future claims. The question of whether a court-endorsed settlement of a class action can by *res judicata* bar future claims of class members has led to a division of authority in other circuits. Compare *Equal Employment Opportunity Commission v. Children's Hospital Medical Center of Northern California*, 719 F.2d 1426 (9th Cir.1982) (consent decree in employment discrimination class action "expressly designed to remedy both past and future claims of class members" has prospective *res judicata* effect) with *Williams v. Vukovich*, 720 F.2d 909, 925–27 (6th Cir.1983) (waiver of claims for future discrimination rejected as impermissible under the rule of *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974)). The Ninth Circuit in the *Children's Hospital* case distinguished *Alexander* because the *res judicata* claim

there arose out of the employee's prior pursuit of arbitration remedies under a private collective bargaining agreement. "The difference between *Gardner-Denver* and this case, therefore, is that here there is a prior judgment encompassing these Title VII claims." 695 F.2d at 414.

I am not aware of any Second Circuit authority directly in point.

However, I need not reach this interesting question because the present defendants have explicitly foresworn any *res judicata* effect upon future claims. That is made crystal clear by defendants' responses to another interrogatory propounded by objectors. While by fair implication the wording of paragraph 7 of the Stipulation refers only to future claims for damages "based solely upon the collection and/or retention of information," any lingering doubt is dispelled by defendants' answer to Interrogatory No. 57. The interrogatory inquires:

"Does the stipulation of settlement, if approved, have a *res judicata* effect on any claim for declaratory and injunctive relief against either disruption of an organization of [sic] invasion of its privacy based in whole or in part upon acts committed by the New York City Police Department prior to the date the settlement is approved? Is the answer the same if the claim is based in whole upon acts committed prior to that date?"

The defendants answered:

"The settlement has a *res judicata* effect with respect to the claims of the plaintiff class for injunctive and declaratory relief as stated in the complaint *where the acts complained of preceded the date of approval of this settlement by the Court*." (emphasis added).

In their brief in support of the settlement, class counsel say that defendants' answers to interrogatories make it clear that the Stipulation "applies only to past acts and does not waive claims for acts in violation of law" and that the de-

---

**21.** See also discussion under Point VI, *supra*.

fendants' assertion of *res judicata* effect is limited "even with respect to declaratory and injunctive relief, to past acts as of the date of approval of this settlement by the Court." Brief at 46. Nowhere in their papers or at oral argument do the defendants question these assertions, which clearly follow from the language employed by the parties in the Stipulation, and by defendants in their answers to interrogatories.

There is no substance to objectors' claim that the settlement unfairly prejudices past, present or future claims.

## VIII.

### Comparison of the Proposed Settlement with Resolutions Elsewhere

Objectors criticize the settlement because, in their view, it does not go as far in restraining police intelligence gathering as results obtained in Seattle by legislation,[22] and in Chicago and Los Angeles by litigation.

■ There is no purpose comparing the proposed settlement in this case (or in any litigated case) with the Seattle ordinance (or any other statute). That is because litigation and legislation are entirely different methods of achieving a social purpose. The objectors recognize the distinction: indeed, in their initial opposition to class certification, they argued that future restraints upon police surveillance could properly be addressed only by legislation, and not by class action litigation. I do not accept that argument; and the suits against the Chicago and Los Angeles police, resulting in court-approved settlements, demonstrate that litigation is a viable alternative. But the fundamental differences between the two processes remain. The Seattle ordinance says what it says because, at that particular time and place, the city legislature was prepared to impose those particular restrictions upon

police surveillance. It is in significant measure a question of home rule. Nothing prevents the objectors or like-minded citizens, now or at any time, from attempting to persuade the New York City Council to enact a comparable ordinance. Indeed, I am told at oral argument that in the mid-1970's, just such efforts were made in this city, but the City Council was not receptive.[23] Thus it appears that an ordinance the Seattle legislature was prepared to enact, the New York City legislature rejected, thereby furnishing examples of local democracy at work in a federal system. Litigation involves not an effort to persuade elected legislators, but an adversary process looking towards a negotiated settlement or, failing settlement, judicial resolution after trial, all within the context of presently existing law. Legislators may change the law; judges (or at least trial judges) may not. Whatever the differences between the Seattle ordinance and the proposed settlement may be, the fundamental differences in the processes by which these resolutions were reached makes one of little value in evaluating the other. It is, quite simply, a case of apples and oranges.

This distinction does not arise with respect to the proposed settlement and the settlements achieved in the Chicago and Los Angeles litigation. Therefore certain aspects of the Chicago and Los Angeles settlements will be considered.

■ Each of the three settlements recognizes, consistent with present law,[24] that police departments may use undercover agents, informers, and other intelligence-gathering means to detect or prevent crime. A primary criticism of the objectors relates to the standard by which the presence of criminal conduct, thereby permitting intelligence-gathering, is to be measured. Under the Los Angeles settlement, preliminary investigation may be initiated

---

**22.** Seattle, Wash.Mun.Code ch. 14.12 (1980) (Seattle, Wash., Police Intelligence Ordinance 108333 (1979)) (amended by Seattle, Wash. Ordinance 109237 (1980)). See discussion of this ordinance in the Chevigny article at 777–782.

**23.** Transcript of June 6, 1984 hearing at 72–73.

**24.** See Points V and VI, *infra.*

"upon reasonable and articulated suspicion...." § IV.A. The Chicago settlement sanctions criminal investigations upon "reasonable suspicion" that evidence of criminal conduct will be obtained. § 3.2. The proposed settlement conditions an investigation upon "specific information" that criminal conduct is present.

I do not attach overriding importance to the choice of these or any particular words. Words are the servants of men, not their masters.[25] I do not see that the proposed settlement stands or falls upon the use or rejection of any particular words or phrases. If, as defendants' counsel profess, the NYPD has abandoned any prior abuses and now views constitutional principles with pure and undistilled enthusiasm, no words of restraint are necessary; the millenium is at hand. If, as objectors apparently believe, the NYPD is mendacious, untrustworthy, and unalterably committed to continuing constitutional violations, no words are sufficient to avoid future controversy. I think it likely that the real world lies somewhere between these two poles; and that effective remedies are achieved not through the choice of one phrase over another,[26] but rather by principles of limitation and restraint, however expressed, uttered within the context of a court's injunctive order.

█ Incorporation of the settlement's provisions in the order of an equity court is of paramount importance. Judge Getzendanner summed it up neatly in *Alliance to End Repression v. City of Chicago, supra,* at 561 F.Supp. 550–51:

> "More important than any internal enforcement mechanism, of course, is the character of the settlement as an injunction enforceable by the Court."

I agree with that assessment, and in consequence do not find it necessary to consider in detail each of the procedural differences between the Los Angeles, Chicago, and New York settlements. Objectors make much of some of them; but I conclude that, singly or in concert, they do not demonstrate that while the Los Angeles and Chicago court-approved settlements are fair, reasonable and adequate, the New York settlement is not.

Indeed, in one significant respect the present settlement achieves a reform not found elsewhere. The reviewing Authority will contain a civilian member. While the Chicago decree provides for ultimate review by civilian "auditors," the police chief is authorized to approve surveillance in the first instance "without civilian input, while the New York settlement provides for civilian participation in the approval process." Counsel for the plaintiff class in the case at bar "thought it important to have the input of some civilian who might act as a brake and sometimes a 'whistleblower.' "[27] Class counsel bargained for that civilian input and obtained it; their assessment of its significance differed somewhat from that of Chicago counsel, who "felt that

---

**25.** " 'When I use a word,' Humpty-Dumpty said, 'it means just what I choose it to mean—neither more nor less.' " Carroll, *Through the Looking Glass and What Alice Found There,* Chap. 6.

**26.** "Reasonable suspicion," which the objectors regard as more potent than "specific information," has been equated for Fourth Amendment purposes to a parole officer's " 'hunch,' arising from what he has learned or observed about the attitude and behavior of the parolee." *Latta v. Fitzharris,* 521 F.2d 246, 250 (9th Cir.), *cert. denied,* 423 U.S. 897, 96 S.Ct. 200, 46 L.Ed.2d 130 (1975). There is ample authority in the lower federal courts, not yet reviewed by the Supreme Court, that "reasonable suspicion" sufficient to justify a police investigatory stop may be based solely on the telephone call of "an unidentified tipster." White, J., dissenting from denial of certiorari in *White v. United States* and *Anderson v. United States,* 454 U.S. 924, 925, 102 S.Ct. 424, 426, 70 L.Ed.2d 23 (1981). Thus the phrase "reasonable suspicion" is hardly a panacea for the concerns expressed by the present objectors. Arguably "specific information" is more stringent; *quaere* whether it would be satisfied by a police officer's nonspecific "hunch." In any event, the plain fact is that the requirement of *any* showing, however phrased, as a prerequisite to police information gathering constitutes a change in present law. The Supreme Court "has not required police to show probable cause or obtain judicial approval before using informers in an investigation." Chevigny article at 739.

**27.** Chevigny article at 765.

civilian oversight in the authorization stage was not as crucial as other elements for which they fought in negotiating the Chicago decree." [28] Under the Los Angeles settlement, investigations are authorized by the police chief and the "undercover investigation committee," drawn from the board of police commissioners, § IV(C), (D); the provision of a draft settlement requiring all undercover investigations to be approved by an "independent determiner" chosen from a list of retired judges [29] did not survive the negotiating process.

Professor Chevigny summarizes the respective positions:

"Arguments can be made in support of either view. If a compliant authorizing board makes hash of a strict standard, one must hope that such activity will be caught in the net of a future review. If the reviewing body employs lax standards or if the original decision is unlikely to be reviewed, then one must hope that the initial authority makes thoughtful decisions. The choice between fighting for meaningful review and fighting for careful initial authorizations, if the choice must be made, ultimately depends on whether one pins one's hopes on the initial decision concerning the investigation or on the review. If forced to choose, I would argue that the initial decision is more important than a review because even the most critical reviewing body will tend to approve the original decision and because it is obviously preferable to prevent, rather than to remedy, abuses. The sad fact is that none of the compromises is entirely satisfactory; a strict investigative standard, an independent warranting body, and an independent reviewing body are needed."

Chevigny article at 766.

I am certainly not in a position to conclude on the basis of any empirical evidence that one of these approaches is "fair, reasonable and adequate" and the other is not. Either approach may play a part in an acceptable settlement.

Presumably counsel for the present objectors would agree with the author that "a strict investigative standard, an independent warranting body, and an independent reviewing body" are all "needed" in order to achieve the ultimate goals of those who wish to limit and restrict the surveillance and intelligence-gathering activities of law enforcement agencies. However, it must constantly be kept in mind that such interests' ability under existing law to compel those procedures is very much in doubt.

It is true, as objectors point out, that the civilian member of the Authority is appointed by the Mayor "upon consultation with the Police Commissioner for a term revocable at will"; that the other two members of the Authority are deputy police commissioners; and the Authority makes decisions by a majority vote. From this objectors argue that "[f]or all practical purposes the oversight is totally internal," main brief at 42 n. 12. I do not accept objectors' denigration of the civilian member of the Authority. That denigration implicitly assumes that the Mayor, at the insistence of the Police Commissioner, will appoint a complaisant, silent booby. I am not prepared to assume that Mayor Koch (or his successor if he has one) would knowingly appoint a complaisant, silent booby to an important body whose work may be subject to court review. Nor am I willing to assume that the civilian member appointed to the Authority would willingly place a gag in his or her mouth and play a supine role. Rather, I am prepared to assume until the contrary is demonstrated that a citizen selected by the Mayor from the community to perform this important and sensitive service would take the matter seriously, and discharge the obligations of the office to the best of his or her ability. To be sure, the other two members of the Authority are deputy police commissioners, and decisions are made by a majority. Consistent with their philosophy of deep skepticism

---

**28.** *Id.* at 766.

**29.** See objectors' main brief at 42 n. 12, submitted before the Los Angeles decree was entered.

and suspicion of police officers' good faith, the objectors view the civilian member as a nullity. Even accepting objectors' philosophy—which I am not prepared to do—the civilian member of the Authority, confronted by constant, bad faith malfeasance by the police majority, could emerge, in Professor Chevigny's phrase, as an effective public "whistle-blower."

In my view, the presence of a civilian member on the body which must approve the initiation and continuation of intelligence-gathering investigations constitutes a significant achievement, within the context of existing law, which class counsel have obtained through arm's length bargaining.

I find myself in agreement with the conclusion Professor Chevigny reaches in his article at 783:

> "The substantive results of all the actions taken in an effort to control local police surveillance, whether embodied in regulations, legislation, or judicial decrees, are generally homogeneous. Purely political, noncriminal investigations have usually been interdicted, and the dissemination of information has been generally restricted to governmental or law enforcement personnel. In some instances, elaborate standards and bureaucratic controls for 'mixed' investigations have been established."

The objectors to the present settlement focus upon the inclusion in other settlement decrees of certain "standards and bureaucratic controls" which are not found here. Such differences are the inevitable consequence of separate negotiations among different parties. But it is useful to recall Judge Getzendanner's judgment that "the character of the settlement as an injunction enforceable by the court" is "more important than any internal enforcement mechanism." The decisive question therefore becomes whether sufficiently meaningful restrictions and limitations are placed upon the NYPD to be the subject of accurate review and, in case of need, judicial enforcement.

That question, I conclude, must be answered in the affirmative. The Guidelines prohibit police intrusions into constitutionally protected activities. The NYPD can no longer commence or continue investigations and surveillance secretly and in silence. A relatively elaborate "paper trail" is generated at various stages of the proceedings, and there is sufficient reason to believe that that paper trail will lead to those in the police department who violate constitutional principles, should such incidents occur. Investigations must be approved by an oversight authority containing a civilian component. Periodic reports, available to public view, must be made. Procedures are instituted for inquiries by individuals or groups who feel that they may have been subject to police scrutiny in violation of the Guidelines. The Court retains jurisdiction over the settlement, with the ultimate power of punishment for contempt.

I conclude that the proposed settlement in the case at bar does not fall impermissibly below the achievements obtained in other litigation.

## IX.

### Preservation of and Access to Records

In their reply brief at Point III, objectors argue that the provisions of settlement for access to records generated by PSS, its predecessors and possible successors, are unreasonable and in derogation of plaintiffs' rights. It is argued that the pertinent provisions of the settlement "in effect destroy and violate rights given to the members of the class by state law," the particular statute being the New York State Freedom of Information Law, Public Officers Law §§ 84–90 (46 McKinney's Consol.Laws of N.Y.) (1984). The thrust of objectors' argument is that the preservation of, and the access of plaintiff class and the general public to, the files generated by the NYPD's intelligence-gathering activities are impermissibly abrogated and limited by the settlement.

I begin consideration of this subject with the reflection that an almost paradoxical

reversal in the parties' positions has taken place during the course of the litigation. The complaint, filed in 1971, specifically sought the destruction of the NYPD's political files. Defendants resisted that prayer. The police wished to keep its files. At that time, the federal Freedom of Information Act, 5 U.S.C. §§ 552 *et seq.*, existed, having been enacted in 1966; but there was no New York State counterpart. The legislature enacted New York's first Freedom of Information Law (hereinafter "FOIL") in 1974. The present wording is the result of amendments made effective January 1, 1978.

The passage of the state statute, occurring during the post-Watergate atmosphere of increased inquiries into governmental misconduct, brought about 180-degree changes of course on the part of the present litigants. The plaintiffs, now regarding the police files "as a precious historical and political resource," Chevigny article at 748, stopped demanding that the police files be destroyed, and insisted instead that they be preserved and revealed. Defendants now wish to destroy the files. Professor Chevigny summarizes the parties' positions during subsequent negotiations: "The defendants were determined to destroy the files; the plaintiffs were determined to keep them." *Id.* at 763. This is, as he observes, a phenomenon frequently observed in cases of this nature:

> "The preservation of the files against the wishes of the police who claim that they would prefer to destroy them has become a major issue in many cases, often more important than any other relief."

*Id.* at 748.

FOIL is important social legislation, reflecting the legislature's conclusion that "[t]he more open the government is with its citizenry, the greater the understanding and participation of the public in government." § 84. I would not favor a settlement which significantly diminished preservation of, or public access to, government documents as provided by existing law. The issue is whether the proposed settlement has that effect.

The settlement, it will be recalled, provides that the intelligence files and cards of PSS and its predecessor units which antedate January 1, 1955 may be disposed of "in accordance with law." For limited periods of time (six months for files containing entries made between 1955 and 1960, and one year for files containing entries after January 1, 1960 to date), individuals and representatives of organizations may inspect on police premises political files gathered on them post-1955. Such files as to which no requests have been received within those periods of time may be disposed of "in accordance with law." Post-stipulation files may be examined upon application unless the file has been maintained properly under the standards of the stipulation, or is related to a current investigation. Denials of inspection are appealable to the Authority.

The key provision is disposition "in accordance with law." It is apparent from the record that the defendants, during negotiations, sought blanket authority to destroy the files outright. However, "[c]lass counsel pointedly declined to negotiate a settlement which would authorize destruction of records in derogation of the rights of the public under existing disclosure and preservation statutes." Brief in support of settlement at 9.

Two laws apply to these records. One of these is FOIL. The other is Chapter 72 of the New York City Charter, added by L.L. 1977, No. 49, July 28.

Chapter 72 of the Charter establishes a department of records and information services. The department includes municipal archives, a municipal reference and research center, and municipal records center. The department is headed by a commissioner, appointed by the Mayor. § 3000. The commissioner "shall be the chief archivist of the city and shall advise the mayor, board of estimate and council on those matters concerning the preservation of the city's historical documentation...." § 3003. The department is required to operate "a municipal archives, the head of which shall be a professional archi-

vist." The archives are directed, *inter alia*, to "preserve and receive all city records of historical, research, cultural or other important value...." §§ 3004, 3004(1)(c).

Section 3005 provides for the "disposal of records." It reads:

"No records shall be destroyed or otherwise disposed of by an agency of the city unless approval has been obtained from the commissioner, the corporation counsel and the agency which created or has jurisdiction over the records who shall base their determinations on the potential administrative, fiscal, legal, research or historical value of the record. Approval for records disposal schedule and remain in force until the status of the records changes. [sic] The commissioner or the agency which created or has jurisdiction over the records may initiate action to eliminate records eligible for disposal. The commissioner shall insure the destruction of disposable records within six months of the date of eligibility. Records retained for historical or research purposes shall be transferred, upon request of the commissioner, to the municipal archives for permanent custody."

The PSS intelligence and political files constitute "records" within the meaning of these provisions. Under section 3010(2), "records" means:

"... any documents, books, papers, photographs, sound recordings, machine readable materials or any other materials, regardless of physical form or characteristics, made or received pursuant to law or ordinance or in connection with the transaction of official city business."

The municipal archives created by Chapter 72 is required to "collect, classify and make available for reference all records which come into the possession of the archives," § 3004(1)(d). The Chapter also creates "a municipal reference and research center," which is required, *inter alia*, to "maintain facilities which shall be open to the public wherein, subject to such reasonable regulation as may be prescribed, all books, reports, documents and other materials shall be available for public inspection ...," § 3004(2)(c).

The objectors point out correctly that FOIL imposes no limitation with respect to access to records based upon the age of the record or the date made. In addition, anyone can obtain a file or record, subject to statutory exemptions, and such records are not limited to one's own records or to the records of an organization with which one may have been affiliated or a member. It follows that, during the six-month and one-year periods of time specified by the settlement for examination of their post-1955 files by class members, the more broad access provisions of FOIL are diminished.

However, FOIL does not undertake to address the preservation of documents. It places no limitation on government agencies in respect of disposition of documents. Such limitations exist, if at all, in the provisions of other laws. As for the NYPD, those limitations are imposed, as we have seen, by Chapter 72 of the New York City Charter.

As noted *infra*, neither side in the settlement process achieved its objective on the issues of document preservation and access. The defendants wished simply to be free of any obligation to preserve or grant access to files in which they themselves had no current interest. They wanted to throw all the old files away. Counsel (after their change of heart initially expressed in the complaint) wanted defendants to retain the files forever, accessible to everyone. In the event, they could not achieve that objective by compromise; but they refused to participate in a settlement sanctioning destruction of the files in defendants' unfettered discretion.

The upshot of the settlement is that no intelligence or political files, pre-1955 or post-1955, can be destroyed without the express approval of the City's commissioner of records and information services, who is specifically charged by the Charter to base his determination "on the potential administrative, fiscal, legal, research or historical value of the record." That is an

approval in which, under § 3005 of the Charter, the corporation counsel must join. I will not assume that the police commissioner would disregard the law by disposing of police records without seeking the requisite approval; nor will I assume that the commissioner of records and information services, and the Corporation Counsel who must advise him, would not take their responsibilities seriously when confronted with such a request. Nothing in the settlement abrogates or diminishes the responsibilities of these municipal officials under the City Charter. Nor does the settlement abrogate or diminish in any way any police obligation derived from FOIL to preserve its files. That is because FOIL contains no provisions in respect of document preservation.

■ In consequence, the settlement's only effect upon existing law of preservation and access is a temporary narrowing of the window of accessibility in respect of post-1955 documents concerning class members. During the specified time periods, only they may apply to examine the files. Considering the broad boundaries of the class, this is not closing the window of accessibility very far. It excludes, during those limited periods, the uninvolved third party—the academic, the social researcher, or historian, in short, members of the general public who are not class members—but it seems to me reasonable enough to permit defendants, during the initial phases of decree-mandated disclosure, to concentrate upon the class members themselves. Nor do I accept objectors' conclusory argument that requiring an individual requesting access to attest to his or her present or prior affiliation or membership with an organization "constitutes a clear violation of the First Amendment," reply brief at 22. Defendants are entitled, during this period of concentration upon the demands of class members, to a showing that the requesting individual in fact has the status contemplated by the class certification. Any "chilling" of First Amendment rights is guarded against by the provision in ¶ 5 of the Stipulation that:

"No list of persons who request search or inspection of class files pursuant to this stipulation may be retained after the conclusion of the search, inspection, and appeal, if any, process."

That assurance is comparable to Part V(C) of the Guidelines, which provides in respect of post-settlement reviews of documents to determine compliance:

"No investigation shall be commenced solely because a party requested a review of records as provided for herein."

■ In sum, I conclude that Professor Chevigny's assessment, expressed in his article at 763, is substantially correct:

"A complete stand-off exists today, with the records in almost the same situation they would have been in had no litigation arisen: the defendants are to dispose of them 'in accordance with law.'"

By "stand-off," the author means that neither party could bend the other entirely to its will on the question of the files. That is not unheard-of in the compromise of litigation. The question before me is whether the settlement's provisions for the preservation of and access to police intelligence and political files, when viewed within the context of existing law, are so unfair and unreasonable as to require rejection of the settlement. I conclude that these provisions work only minimal changes upon existing law, and certainly do not create problems rising to the level of requiring rejection.

## X.

### Future Representation of Class Members

One dispute appears to still exist between class counsel and defendants. The objectors focus upon it as an additional basis for rejecting the settlement.

That dispute has to do with the legal representation of class members in case claims of violation of the settlement arise in the future. On that point, it will be recalled that paragraph 6 of the Stipulation provides as follows:

"6. Counsel for plaintiffs shall notify defendants by certified mail of any

claimed violation by defendants of the provisions of this stipulation. That notice shall specify the violation and shall be made to both the Office of the Corporation Counsel and the Police Commissioner. Counsel for plaintiffs agree to provide 30 days notice of any claimed violation by defendants of the provisions of this stipulation in order to give defendants a reasonable opportunity to cure such claimed violations as a condition precedent to moving to punish defendants for contempt."

The dispute concerns the meaning of the introductory phrase "counsel for plaintiffs." The defendants apparently take the position that only present class counsel are authorized to lodge future claims of violation of the settlement and court decree, or to seek to hold defendants or any of them in contempt. Defendants assert, in their answer to Interrogatory No. 21, that if class counsel refuses to proceed in respect of a claimed violation, that determination is binding on the class; and if class counsel are "too busy to proceed" or are "no longer practicing law in New York," class counsel would have to be substituted on motion. As noted in objectors' main brief at 32, present class counsel join the objectors in taking a different view of subsequent allegations of violations and proceedings for contempt. Their view is that any attorney for a member of the plaintiff class could initiate contempt proceedings.

■ The fact that the parties to the settlement are in disagreement on this particular term does not doom the entire settlement to rejection. While it is generally true that the trial court cannot adjudicate the merits of the issues, but must accept or reject the settlement as it finds it, there is also authority for the proposition that the judge may focus upon a particular provision in the settlement, disapprove the settlement agreement "at least in part," and require "the parties to litigate the issue." *Kincade v. General Tire and Rubber Company,* 540 F.Supp. 115, 120 (W.D.Tex. 1982), *rev'd on other grounds,* 716 F.2d 319 (5th Cir.1983). After reciting the general rules that the trial court does not adjudicate the dispute, but must make a decision "whether or not to approve the settlement," the district court in *Kincade* went on to say:

"It follows that the district court may not unilaterally alter an element of the settlement agreement without disapproving *that element of the agreement* and requiring the parties to litigate the point."

*Ibid.* (emphasis added).

Implicit in that analysis is the recognition that some elements of a complex settlement agreement may be sufficiently discrete or severable to lend themselves to judicial resolution without rejecting the entire compromise. It is possible, in short, to improve the vessel's trim by flooding a single compartment, without being required to scuttle her entirely. And it is a good thing for the salutary principle of settling class actions that this is true.

Particularly in this case, where the point at issue relates not to the merits of the settlement but to procedural provisions for its future enforcement, I see no impediment to my resolving the issue at this time. I do not see the need for further "litigation" by the parties. Their positions are clear enough.

■ I resolve the ambiguity in paragraph 6 of the Stipulation by adopting the interpretation urged by class counsel and the objectors. It would be inconsistent with sound judicial administration and case management to require that any future contempt proceeding be initiated by present class counsel. This is a very large class; its membership extends unto "generations yet unborn." Present class counsel are highly competent and imaginative, but I doubt that they are immortal. Messrs. Eisenstein and Stollar are members of relatively small firms; Mr. Siegel apparently practices law by himself; and Professor Chevigny, given his academic responsibilities, presumably practices law on a part-time basis. No legitimate purpose would be served by confining all future litigation to enforce the Court's order to these partic-

ular mortals. Nor would any legitimate purpose be served in requiring separate class counsel to be substituted for future, individual enforcement purposes. Class counsel have fulfilled their essential professional purpose and obligation by initiating an appropriate class action; obtaining class certification; and negotiating a settlement. Class members will in future continue to benefit by the efforts of present class counsel; but the only sensible and practical manner in which to provide for future enforcement of the Court's decree, should that prove necessary, is to permit any class member feeling aggrieved to retain counsel of his, her, or its choosing to prosecute the claim. That is consistent with Judge Getzendanner's order retaining jurisdiction in *Alliance to End Repression v. City of Chicago, supra,* at 561 F.Supp. 570. Her order provided in pertinent part:

> "Application to enforce such provisions or to impose punishment for any such violation may be presented to this Court by any person affected by the conduct complained of."

I may, without rejecting the main body of the settlement, resolve this discrete procedural dispute between the parties by including a comparable provision in the Court's order, which should specifically provide that complaining class members may select counsel of their own choosing.

## XI.

### Evaluation of the Settlement

■ I conclude that the proposed settlement of this difficult and sensitive class action is fair, reasonable and adequate. It will be approved.

The complaint alleged constitutional violations of NYPD information gathering and surveillance conducted on a whim, in secrecy, without any civilian or judicial oversight, whose poisoned fruits were indiscriminately disseminated abroad. Following NYPD denials of any wrongdoing, coupled with an expressed desire to thrown all the files away, litigation, discovery, and armslength negotiations ensued. Highly competent counsel for the certified class fought for their objectives. Equally competent counsel for defendants fought back. There was no collusion. There was no overreaching.

A settlement emerges which imposes restrictions and limitations on such police activities, consistent with existing law; exposes police surveillance and intelligence gathering to the light of day through "paper trail" requirements; creates an oversight authority with a civilian component and the obligation to make public reports; limits dissemination of properly obtained information to other law enforcement and government security agencies; preserves the files for posterity in accordance with existing law, and makes them immediately accessible (with reasonable limitations) to class members. All this is subject to the Court's continuing equity power to ensure compliance.

■ Some class members object. Their statement (main brief at 3) that "[n]o one has appeared in support of the settlement other than a few of the named plaintiffs, counsel for the class and counsel for the Police Department" is, to say the least, misleading.[30] But I accept that the objec-

---

**30.** The Eisenstein affidavit, *supra,* lists at ¶ 5, without subsequent contradiction by objectors, a number of prominent class members and citizens active in civil rights, who have submitted affidavits in support of settlement. These include Paul O'Dwyer, Esq. and Professor Aryeh Neier, formerly national director of the American Civil Liberties Union, with personal involvement in many court cases involving political surveillance and First Amendment rights. Affidavits in support of the settlement have also been received from Kathleen Imholz, Esq. and Dr. Morton H. Halperin, who have comparable experience in the field. Indeed, Dr. Halperin

was called by the ACLU as an expert witness in the Chicago litigation before Judge Getzendanner. See 91 F.R.D. at 193–94.

I mention these advocates of the present settlement to correct the objectors' erroneous statement. It should also be observed, however, that the numbers of class members supporting or opposing settlement has never been regarded as decisive in the trial court's independent evaluation. It is recognized that "a settlement is not unfair or unreasonable simply because a large number of class members oppose it." 3B Moore's Federal Practice (2d ed. 1984) at ¶ 23.-

tors are sincere in their opposition. They do not believe the settlement achieves all the reforms they consider necessary. Comparable objections were made to the Chicago settlement. Objectors are right. The settlement does not achieve everything they wish for. Few settlements do. But insisting on everything disregards the limitations, legal and equitable, arising out of present law which furnish the primary benchmarks by which the settlement must be evaluated.

Because, contrary to objectors' claims, the settlement does not initiate or authorize illegal conduct, the settlement does not suffer from fatal taint. Had objectors been able to sustain that particular charge, the conclusion might differ: paraphrasing Matthew 7:9, we could then ask, "what settlement is fair, if the class ask for bread, and it give them a stone?" But there is no unconstitutional stone in this settlement. The bread may be half a loaf; but half a loaf, proverbially better than none, is the staff of compromise.

Given the cost and uncertainty of litigation, and viewing the settlement in the light of existing law, I approve it as fair, reasonable and adequate.

## XII.

*Conclusion*

The Court will enter an order approving the proposed Stipulation of Settlement and accompanying Guidelines as fair, reasonable and adequate.

To permit a meaningful appeal, if objectors are so advised, I will stay the running of the time periods specified in ¶ 2(a) and (b) of the Stipulation, as well as the giving of notice by publication called for by ¶ 3, until 30 days after all appeals, if any, have been exhausted. It would be unfair to start six-month and one-year time periods

for inspection of documents running from the date of this Court's order, where an appeal might require a longer time to adjudicate.

For the sake of consistency, the defendants' obligation to promulgate and enforce the Guidelines is stayed for a like period.

■ I also will require broader notice of access by publication than that required by ¶ 3 of the Stipulation, which is limited to one publication in the New York Times. Defendants will be required to publish the notice on two succeeding Wednesdays and two succeeding Sundays in the New York Times, the New York Daily News, El Diario, and the Amsterdam News. If any of these newspapers do not have Sunday editions, notices in them will be published on two succeeding Mondays and two succeeding Fridays. The expense of publication will be borne by defendants. I do not doubt my power, in aid of proper and fair case management, to alter this procedural aspect of the settlement.

Counsel for plaintiff class are directed to settle an order, on five (5) days' notice to defendants and all objectors of record, approving the settlement and retaining jurisdiction, all in conformity with this opinion.

It is SO ORDERED.

## APPENDIX A

### STIPULATION OF SETTLEMENT AND ORDER

WHEREAS, plaintiffs have instituted this action, pursuant to 42 U.S.C. § 1983 seeking declaratory and injunctive relief for alleged violations of the 1st, 4th, 5th, 6th, 9th, 13th and 14th Amendments to the United States Constitution by defendants in gathering, maintaining and disseminating information resulting from investigations of persons' or organizations' political

---

80[4], p. 23–523. Some named plaintiffs have approved the settlement; the unanimous approval of all named plaintiffs is not a prerequisite to judicial approval. *In re General Motors Corporation Engine Interchange Litigation,* 594 F.2d 1106, 1128 n. 34 (6th Cir.1979). On the other hand, that case also stands for the propo-

sition that a settlement may be disapproved by the court even if the majority of class members approves it. The bottom line is that a settlement stands or falls upon its merits, and not upon a head count between its proponents and objectors.

beliefs, opinions or associations by recruiting, soliciting or maintaining employees as members of or informants within political organizations, electronic eavesdropping and other forms of surveillance; and

WHEREAS, the defendants have submitted an answer denying each and every allegation of the complaint and specifically the aforementioned allegations; and

WHEREAS, the Court has certified a class defined as follows:

"All individuals resident in the City of New York, and all other persons who are physically present in the City of New York, and all organizations located or operating in the City of New York, who engage in or have engaged in lawful political, religious, educational or social activities and who, as a result of these activities, have, been, are now or hereafter may be subjected to or threatened by infiltration, physical and verbal coercion, photographic, electronic and physical surveillance, provocation of violence, recruitment to act as police informers and dossier collection and dissimination by defendants and their agents." and,

WHEREAS, "defendants" include the named defendants and any successor organization or unit within the New York City Police Department or, in the case of individual defendants, their successors in office or function; and

WHEREAS, the parties herein desire to settle this action upon the terms hereinafter set out in order to dispose of the controversy between the parties, therefore

IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned, being counsel for all the plaintiffs, the plaintiff class and the defendants in the litigation, that in view of the settlement reached between the parties, the within action is discontinued and dismissed with prejudice upon satisfaction of the following terms and conditions:

1. Defendants will, within 30 days of entry of this stipulation by the Court, promulgate and adopt "Guidelines" (attached as Exhibit A and made a part here-

of) establishing an "Authority" to oversee the activities of the Public Security Section of the Intelligence Division of the New York City Police Department. These "Guidelines" have been established through negotiations between the parties and articulate a balance between political expression and police responsibility for investigation of criminal conduct.

2. The defendants currently maintain information on cards and files in Room A10 Police Headquarters. Defendants are authorized to dispose of all cards maintained in that room and all files maintained in that room predating January 1, 1955 in accordance with law. With respect to the remaining files defendants shall dispose of them in accordance with the following:

(a) All files containing entries made on or after January 1, 1955 and before January 1, 1960 shall be maintained for a period of six months following entry of this stipulation. Thereafter defendants may, in accordance with law, dispose of files for which no request has been received within the six month period.

(b) All files containing entries made on or after January 1, 1960 to date shall be maintained for a period of one year from the date of entry of this stipulation and order. Thereafter defendants may dispose of files, in accordance with law, for which no request has been received within the one year period.

3. Defendants shall, within 30 days of the entry of this stipulation and order, give notice by publication in the New York Times to members of the plaintiff class of their opportunity to inspect and copy information referred to in ¶ 2 above. The notification will read as follows:

NOTICE IS HEREBY GIVEN that the New York City Police Department, Public Security Section, is making available for inspection files dating from the period January 1, 1955 to December 1980. You may inspect any documents bearing your name by filling out a request form at Police Headquarters which shall,

whenever possible, identify the date, the place, the event or the organizational affiliation relevant to your request. At the time of filing such request you must provide two types of identification satisfactory to the New York City Police Department. You may inspect any document in which the name of an organization appears if you are currently an authorized representative of such organization. One such request shall be authorized by each organization. Documents for an organization no longer active at the time of request may be given to a person who swears or affirms that he or she was a member of such organization. The procedure for filing a request for organizations is the same as that for individuals. The Police Department shall review your request and notify you of the existence or non-existence of the requested material. Where the material requested exists you shall be notified of a date for inspection and copying. The reasonable cost of copying will be charged the requesting individual. You may also be notified that, although the requested materials exist, they are exempt from disclosure for enumerated reasons and be notified of an appeal procedure.

Individuals residing more than 150 miles from New York City may file a request for inspection by submitting an affidavit proving their identity by reference to an address, valid license number, birth certificate or passport. Where the material requested exists and is not exempt you shall be so notified and, upon prepayment of the costs of copying and postage, the material will be sent to you. For files containing entries made between January 1, 1955 to January 1, 1960, you have until 1981 to make your request. For files containing entries made on or after January 1, 1960 you have until , 1981 to make your request.

4. The defendants agree that upon receipt of a request for inspection, they shall review the files in Room A10 as well as current files maintained by the PSS. The defendants shall be authorized to deny requests for inspection when the requested file relates to a current investigation or when information was collected in the course of an investigation based on specific information that the subject engaged in, was about to engage in, or threatened to engage in conduct constituting a crime or when the disclosure of the file would endanger the life or physical safety of any person. In case of any denial, the appeal procedure shall be a written request for review by the Authority established in the annexed guidelines. This procedure may also be employed for denial of the existence of requested information.

5. No list of persons who request search or inspection of class files pursuant to this stipulation may be retained after the conclusion of the search, inspection, and appeal, if any, process.

6. Counsel for plaintiffs shall notify defendants by certified mail of any claimed violation by defendants of the provisions of this stipulation. That notice shall specify the violation and shall be made to both the Office of the Corporation Counsel and the Police Commissioner. Counsel for plaintiffs agree to provide 30 days notice of any claimed violation by defendants of the provisions of this stipulation in order to give defendants a reasonable opportunity to cure such claimed violations as a condition precedent to moving to punish defendants for contempt.

7. This stipulation constitutes a full and final adjudication with respect to the claims of the plaintiff class for injunctive and declaratory relief as stated in the complaint. Any claim based solely upon the collection and/or retention of information about a person or an organization by the New York City Police Department is also settled by this stipulation.

Dated: New York, New York
 December , 1980

ALLEN G. SCHWARTZ
Attorney for the Defendants
100 Church Street, Rm. 6C14
New York, N.Y. 10007
(212)566–2309

MARTIN R. STOLAR
STOLAR, ALTERMAN & GU-
LIELMETTI
350 Broadway—Suite 1207
New York, N.Y. 10013
(212)226-2800

JETHRO EISENSTEIN
170 Broadway
New York, N.Y. 10038
(212)349-7360

PAUL CHEVIGNY
40 Washington Square South
New York, N.Y. 10012
(212)598-2504

FRANKLIN SIEGEL
293 State Street
Brooklyn, N.Y. 11201
(212)269-3939

Attorneys for the Plaintiffs

SO ORDERED:

UNITED STATES DISTRICT
JUDGE

### GENERAL STATEMENT OF POLICY

Activities of the Public Security Section (hereafter PSS) of the Intelligence Division will conform to constitutionally guaranteed rights and privileges. Information shall be collected, retained and disseminated by the PSS only in accordance with the provisions set forth herein.

### II. DEFINITIONS

A. *Political Activity*

The exercise of a right of expression or association for the purpose of maintaining or changing governmental policies or social conditions.

B. *Authority*

A board established pursuant to Section III of these Guidelines.

C. *Investigation*

A police activity undertaken to obtain information or evidence.

D. *Undercover*

An employee or agent of the New York City Police Department who joins or participates in a political organization for the purpose of investigation without disclosing police affiliation.

E. *Investigator*

An employee of the New York City Police Department who attends public functions of a political organization for the purpose of gathering information on political activity without disclosing police affiliation.

### III. AUTHORITY ESTABLISHED

There is hereby established an Authority to oversee the activities of the PSS of the Intelligence Division. It shall consist of three members who shall act as a body, to wit, the First Deputy Commissioner of the Police Department, the Deputy Commissioner for Legal Matters of the Police Department, and a civilian member appointed by the Mayor upon consultation with the Police Commissioner for a term revocable at will. The decisions of the Authority as set forth herein shall be by majority vote and shall be binding upon the PSS. The day-to-day operations of the PSS of the Intelligence Division shall continue to be the responsibility of the Commanding Officer, Intelligence Division.

### IV. CONDUCT OF INVESTIGATIONS AND ROLE OF AUTHORITY

A. The Police Department shall not engage in any investigation of political activity except through the PSS of the Intelligence Division or its successor and such investigations shall be conducted as set forth in these guidelines.

B. Upon receipt of information concerning a planned event, the PSS may conduct an Event Planning Inquiry (EPI) in order to preserve the peace, deploy manpower for control of crowds and to protect the right

of individuals to freedom of speech and assembly. Police personnel engaged in an EPI may seek only the following information:

1. The date, time and place of the event.

2. The purpose, reason or cause of the event.

3. The type of activity planned.

4. The number of persons expected.

5. The mode of transportation to be used.

6. The routes of travel to be taken.

7. Whether placards and signs on sticks or poles or weapons will be carried.

8. Whether a counter-demonstration is expected.

9. The name of the sponsoring organization, if any, and the names of officials or persons in authority within the organizations to be used as contacts by the PSS, if necessary.

10. The number of marshals, if any, expected to be present and how they will be identified.

All contact with the organization shall be through the designated contact officials or persons whenever practicable. The personnel conducting the EPI shall identify themselves as police officers and explain the reason for the interview. The PSS of the Intelligence Division may retain a central repository of information concerning past events. No person's or group's name shall be included in the files of the PSS by reason of inclusion of such name in an EPI report. The information so retained may be used only to document claims for governmental funding or reimbursement, and to assist in allocation of Police Department resources for future events. No other information gathered in the course of an EPI shall be retained unless an investigation on the basis set forth in Section C, below, is undertaken.

C. When specific information has been received by the Police Department that a person or group engaged in political activity is engaged in, about to engage in or has threatened to engage in conduct which con-stitutes a crime the PSS is authorized to commence an investigation of such person or group subject to the following limitations:

1. Prior to initiating such an investigation, the PSS shall submit to the Authority an Investigation Statement which specifies the factual predicate therefor. Upon good cause shown, the Investigation Statement may be filed within 48 hours after such initiation. This 48 hour period shall not include Saturdays, Sundays and legal holidays.

2. When an investigation under Section C is commenced it may be conducted for a period of 30 days without approval from the Authority, provided that an Investigation Statement has been filed.

3. Within 30 days after the initiation of an investigation the PSS shall request from the Authority, in writing, approval to continue the investigation beyond the 30 day period. If, at the expiration of the 30 day period, no request has been made by the PSS, the Authority shall notify the PSS of the expiration of the 30 day period and if the PSS fails to request an extension within 48 hours (excluding Saturdays, Sundays and legal holidays) after the receipt of the Authority's notice, the Authority shall direct the discontinuance of the investigation and the submission of a report.

4. Any request for an extension of the investigation must contain a summary of the information obtained to the date of the request, including any information obtained upon the execution of judicially approved warrant(s), except where such disclosure is precluded by law. In the event of such request, the Authority may

a) Grant the extension for an additional 60 day period, if the PSS has demonstrated good cause for the investigation and demonstrated that such extension is necessary to reasonably pursue the investigation; or

b) Deny the extension, if the PSS has failed to show good cause or failed to show that the extension is necessary. In such event the Authority shall direct the discontinuance of the investigation and the sub-

mission of a report, and determine the action to be taken with respect to the files generated by such investigation. The procedures described in paragraphs IV(C) 3 and IV(C) 4 shall be followed for each subsequent extension request made to the Authority by the PSS.

5. The Authority shall not be a substitute for any prior judicial screening required by law. Accordingly, these procedures shall not be construed either to prevent or relieve the PSS, where applicable provisions of law require, from seeking a judicial warrant authorizing conduct, such as searches and seizures of persons, places or things or communications, for which such warrant is required by law.

6. Use of undercover personnel, in an investigation covered by Section IV(C) hereof, will be permitted only after approval by the Authority. Application for approval shall be made by the Commanding Officer of the Intelligence Division. The application shall be in writing, and shall set forth all the salient facts of the investigation, as well as the reasons for the application.

a) Approval will be granted only upon a showing to the Authority that there is good cause for the investigation and that the use of undercover personnel is essential to develop information about the activities of the person, group or organization under investigation. In the absence of such a showing, approval for the use of undercover personnel shall be denied.

b) The Authority shall act on a request for approval of use of undercover personnel within 15 days after such request is received. Each approval shall be for a period of 30 days. Extensions for 60 day periods shall be sought and may be granted on the same terms and conditions as approval in the first instance.

c) Upon a showing of exigent circumstances, the request for approval may be submitted within 48 hours, exclusive of Saturdays, Sundays or legal holidays, after the commencement of use of undercover personnel. The Authority shall act on each such request within ten days. If exigent circumstances are not shown, such request for approval shall be summarily denied, and the Authority shall order the undercover operation terminated.

7. Attendance by investigators at public activities of political organizations except for the purpose of collection of IV(B) information, shall be governed by the general procedures set forth in these Guidelines which require the filing of an Investigation Statement but do not require prior approval by the Authority.

8. Use of electronic or mechanical surveillance in cases where a warrant is not required by law shall be governed by the general procedure set forth in these Guidelines which require the filing of an Investigation Statement but do not require prior approval by the Authority.

## V. REVIEW OF RECORDS TO DETERMINE COMPLIANCE

A. At any time, a person or a member of a group or organization having reason to believe that such person, group or organization has been named in PSS files as a result of an investigation in connection with or related to his, her or its political activities, may request in writing which sufficiently identifies the requesting party that the Authority make an inquiry of the PSS. Upon receiving such a request, the Authority shall inquire of the PSS whether it maintains a file including the name of such person or group. If such file does not exist (appear) or if the Authority's inquiry reveals that an investigation was conducted in conformity with these Guidelines, the Authority shall notify the requesting party that if such an investigation was made it was conducted in conformity with these Guidelines. The Authority shall record that fact in its annual report in accordance with Section IX below. If such name appears in the files, the PSS shall disclose to the Authority:

1. Whether an investigation has been conducted with respect to the named individual, group or organization.

2. The manner in which the investigation was conducted.

3. The information gathered.

B. If the inquiry reveals or if the Authority otherwise becomes aware that an investigation was not conducted in conformity with these Guidelines, the Authority shall proceed as follows:

1. The Authority shall obtain from the PSS all information and documents developed in the course of such investigation.

2. The Authority shall conduct or cause to be conducted an inquiry into the causes of such non-compliance.

3. In the event the inquiry confirms the fact of such non-compliance, then the Authority shall submit a report to the Police Commissioner, who shall initiate disciplinary measures as appropriate.

4. The Authority shall determine the disposition of any information improperly acquired. Such determination shall include:

a) notification to the subject individual or group that such non-complying investigation occurred, and that the subject may, within 30 days, request permission to inspect, except as set forth in subdivision (e) below;

b) upon request of such subject individual or group, received within 30 days of such notification, the granting of permission to inspect improperly acquired material; unless upon a showing of exigent circumstances the Authority decides that such disclosure may be postponed for a period of 45 days; and thereafter;

c) the destruction of the material improperly acquired; or

d) the retention of the material. In the event of such retention the order shall be reduced to writing, setting forth the reasons for the retention and the order shall be attached to the file containing the information at issue.

e) no disclosure of the improperly obtained information shall be made where the Authority has determined that disclosure would result in a substantial threat to the life or safety of an individual; or where there is a predicate for an on-going investigation under these Guidelines. Then Section V(B)(3) obtains.

C. No investigation shall be commenced solely because a party requested a review of records as provided for herein.

## VI. PERMITTING ENTRIES TO FILES AND INDEX CARS OF PUBLIC SECURITY SECTION—SPECIFIC CRITERIA

A. Information concerning individuals, groups or organizations shall be collected, maintained and indexed only when collected pursuant to these Guidelines. Information from publicly available sources shall not be indexed or filed in the PSS.

B. The PSS Record Unit shall not maintain the following information on a group or individual without the written authorization of the Authority:

1. Information indicating that an individual has signed a political petition.

2. Information that the individual's name appears on a mailing list.

3. Information indicating that an individual monetarily supported a political or religious group or its aims.

4. Information indicating that an individual has authored a published writing expounding a particular political or religious view.

C. An individual's or organization's political, religious, sexual or economic preference may not be the sole basis upon which the PSS develops a file or index card on that individual or organization.

## VII. DISSEMINATION OF RECORDS

A. Information collected pursuant to these guidelines may be distributed only to law enforcement agencies or government agencies conducting security clearance procedures. Requests for information may be made by telephone, so long as the identity of the caller is confirmed, a record is made of the request, and the request is subsequently reduced to writing by the request-

ing party and forwarded to the Police Department, PSS.

B. All requests for intelligence information shall be screened. The Commanding Officer (or an available superior officer, in his absence) must evaluate and approve the action before any information may be distributed. Where information is provided a written report of the action taken with respect to such requests shall be made. Each request shall specify the need for the information, its relevance to the performance of the official duties of the requesting agency, and the reliability of the requesting agency in treating the information with requisite care and sensitivity.

C. In evaluating the propriety of dissemination in any case, the Commanding Officer shall be governed by the basic policy that the less reliable or significant the information, the less desirable the distribution of it to other agencies.

D. No information shall be disseminated pursuant to these Guidelines, whether verbal or written, unless the requesting agency agrees in writing to conform strictly with the provisions of these procedures, including destruction of the information when the Police Department is obliged to destroy it. Relevant sections of these guidelines will be furnished to agencies at the time of their initial request for information. Information disseminated under these procedures will have the following restrictive statement prominently stamped on the cover letter to the requesting party:

THE INFORMATION FURNISHED IS DISSEMINATED PURSUANT TO GUIDELINES IN FORCE FOR THE PUBLIC SECURITY SECTION OF THE INTELLIGENCE DIVISION OF THE NEW YORK CITY POLICE DEPARTMENT AND IS THE PROPERTY OF THAT DEPARTMENT. A FEDERAL COURT ORDER REQUIRES THAT IT NOT BE DISCLOSED TO ANY PERSON OR ORGANIZATION WITHOUT THE EXPRESS AUTHORIZATION OF THE NEW YORK CITY POLICE DEPARTMENT.

E. In each instance of dissemination of retained information to an agency outside the New York City Police Department, the date, the reason for the dissemination and the name of the agency to whom disseminated shall be endorsed on the file or file entry involved, and a master list of such instances of dissemination shall be maintained, containing the same information.

F. If any information on file is found to be inaccurate, the Intelligence Division Commander will notify all agencies to which the information was previously disseminated of its inaccuracy.

## VIII. REVIEW OF PROCEDURES

Every 12 months the Intelligence Division Commander shall cause a review to be made of the PSS files of the Intelligence Division and shall submit a written report of that review to the Authority. The purpose of the review shall be to determine to the fullest extent possible that no files are being kept which violate Guidelines.

## IX. REPORTING REQUIREMENT

A. Each calendar year the Authority shall prepare a report specifying:

1. The number of investigation statements filed by the Intelligence Division.

2. The number of extensions granted.

3. The number of extensions denied.

4. The number of PSS files disclosed to individuals or groups.

5. The number of Public Security files destroyed.

6. The number of violations of these procedures by the PSS and the remedial steps taken.

7. The total number of files disseminated to other governmental agencies in the calendar year.

8. The number of PSS files added in the previous calendar year and the total number of outstanding security files with regard to individuals or groups.

B. The annual report shall be turned over to the Police Commissioner for submission to the Mayor.